**People of the State of Illinois, Plaintiff-Appellee, v. Phillip K. Guthrie, Defendant-Appellant.**

**Gen. No. 11,029.**

Fourth District.

May 21, 1970.

Prentice H. Marshall, of Urbana, for appellant.

Basil G. Greanias, State's Attorney of Macon County, of Decatur, for appellee.

SMITH, P. J.

The defendant was indicted with his half brother, John A. Weller, for the murder of Howard Richard Goodin, a Decatur barber. When it appeared that Weller had made a statement to the police directly implicating Guthrie in the killing and had asserted that Guthrie told him that he killed the "barber," Guthrie's motion for a severance was granted. Weller was tried and convicted of murder and sentenced 40 to 60 years in the penitentiary. In an opinion filed today, we have reversed and remanded that case for new trial, 123 Ill App2d 421, — NE2d —. The week following Weller's trial, Guthrie was tried with a different jury panel and was likewise convicted and sentenced to the penitentiary for a like term. Weller did not testify in the trial of Guthrie's case.

Guthrie did testify in Weller's trial and his testimony was calculated to exculpate Weller from any direct responsibility for the death of the barber. Guthrie's testimony in the Weller trial was read into evidence in this trial as an admission.

■ It is the defendant's first contention that these two cases were so interwoven in point of time and content that the allowance of the severance amounted to fiction rather than fact and that the defendant was thus deprived of due process of law. We cannot agree that the interweaving of the two cases mandates a new trial. The circumstances of the occurrence events irretrievably wove them together. Guthrie, after conference with his attorney, testified in the Weller case and interwove them. It is self-evident that he knew or should have known that his testimony in the Weller trial would be used against him in his own separate trial.

The defendant offered an instruction on involuntary manslaughter and it was refused. The State objected to the instruction on the ground that factually this was either murder or nothing and the trial court indicated that the State's Attorney was "going for broke." Guthrie's testimony in the Weller case, read into evidence in this case, stated in substance that he alone had handled the entire transaction, that Goodin was unhappy with his automobile and about 11 o'clock one night at a tavern he and Goodin decided to carry out a previously discussed plan to defraud Goodin's insurance company. In conformity with that plan, they drove out into the country, Goodin got a rope from the back end of the car and they both went into a cornfield. Guthrie tied Goodin about his ankles and wrists with some fourteen to eighteen inches of rope between the ankles and wrists. Guthrie stated that they had to tie the knots tight enough so that it would not on its face appear to be a hoax, but an actual robbery. Guthrie had had experience

in the Navy with rope tying and stated that he supposed Goodin would have some difficulty in moving around, but probably could move somehow or another. It was a part of the plan that Goodin would attract the attention of someone on the road but that this would not occur until some time intervened, so that Guthrie would be well on his way to Florida for the purpose of selling the car. After Goodin had attracted attention, he would contact the police, report the robbery and then contact Guthrie in Florida, either through Western Union or by notice in the paper, and would mail the car title to Guthrie in Florida. Goodin was to collect the insurance money by representing that his car was stolen and Guthrie was to sell the car in Florida and he and Goodin would split the proceeds.

Guthrie then went by his stepfather's home and picked up Weller, telling Weller that they would take their often-discussed trip to Florida and that a friend had asked him to drive the car to Florida. Guthrie's wife and children were not informed of this trip, Weller did not inform his parents, and when Guthrie first went by the house, his stepfather's car was there and he did not go in. Guthrie also testified, as did two girls from Florida, that he and Weller registered under their own names at several motels in Florida. After about three weeks, they told the girls they were going to Western Union as they needed some money. On their return, they appeared nervous and excited and stated they were returning to Decatur. On their return, Weller called a friend and was advised that the police were after him. Guthrie and Weller then walked out to where Goodin's body was, and for the first time, Guthrie informed Weller of what had happened. Guthrie called Donald Weller, another half brother, and asked him to meet him at the library. They then drove into an Eisner parking lot and had some conversation. Guthrie asked Donald if he knew anything about the incident and Donald replied that he knew all

410

about the "barber—Johnnie had told him." Donald then testified that Guthrie told him he wanted him to get a shovel, food and some other things and take him out to where the body was after dark. Guthrie likewise told Weller "I told him where I was going to go. I asked him to get a shovel so I could bury the body." Such was Guthrie's testimony.

 The defendant complains that it was prejudicial error to give a flight instruction. The circumstances under which the defendant left the State of Illinois were explained solely by his own testimony about the purpose of his trip to Florida. It is well established in Illinois that if there is logic in the presumption that only the guilty would flee, then by the same logic it must be presumed that only the innocent would return and surrender themselves to the authorities and it has been held error in this State not to permit the defendant to give evidence of his voluntary return and surrender to the police. People v. Davis, 29 Ill2d 127, 193 NE2d 841. We perceive no error in the giving of the flight instruction in this case. True enough, the defendant returned to Decatur voluntarily. By his own statements and actions, however, Guthrie establishes that he did not intend to go to the police or be seen by the police until such time as he had disposed of the body. No matter what theory of the facts is accepted, Guthrie's statement to Donald Weller about burying the body suggests that he left the State of Illinois knowing that a crime had been committed and on his return, set out to bury the evidence of that crime. There was no error in giving the flight instruction. It should be noted that since this case was tried, the Committee on Criminal Instructions has recommended that no flight instruction be given but its substance should be left to argument.

 When Weller and Guthrie departed for Florida, what crime was then complete? Was it murder? Was it manslaughter? Or was it only a conspiracy to defraud an

insurance company? Under our statute a person is guilty of murder when he kills an individual without lawful justification if in performing the acts which caused the death ". . . (2) He knows that such acts create a strong probability of death or great bodily harm to that individual . . . ." Ill Rev Stats 1967, c 38, § 9–1. Goodin was placed about ten rows back in a field of tall corn, somewhere around midnight, far from the road and on an isolated and little traveled highway. The nearest house was some distance. It is not likely that at that hour and time he would be able to make his way to the road and attract any attention. Guthrie himself felt that Goodin had to be tied tight enough so that the police and the insurance company wouldn't suspect that the whole deal was a hoax and he, Guthrie, also needed ample time to make his getaway to Florida. From the circumstances in this record, a jury might well believe beyond a reasonable doubt that Goodin was dead before Guthrie left the cornfield or that Guthrie knew or should have known that tying him in this fashion at that place under such circumstances created a strong probability of death or great bodily harm to that individual. No matter what explanation is given for tying Goodin in the cornfield, the cold, blunt fact remains that as done, there was a strong probability of death or great bodily harm from such acts and that he died while so tied. We have no difficulty in believing that reasonable minds could well agree on this point. We therefore conclude that there was sufficient evidence to support and sustain the verdict of the jury as to murder.

What we have just said does not preclude, however, the possibility of involuntary manslaughter. Involuntary manslaughter is defined as "(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and

he performs them recklessly." Ill Rev Stats 1967, c 38, § 9–3. Thus, the difference between murder and involuntary manslaughter rests in the *knowledge* in murder that the acts performed create a strong probability of death or great bodily harm to an individual, while in involuntary manslaughter if the acts which cause death are done recklessly, they are done recklessly ". . . when he consciously disregards a substantial and unjustifiable risk . . . and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. . . ." Ill Rev Stats 1967, c 38, § 4–6. Thus, the recklessness intended by the statute would indicate that involuntary manslaughter occurs where the acts are performed with a conscious awareness of risk and a gross disregard thereof. See Committee Comments, Ill Rev Stats 1967, c 38, § 9–3. Accepting for the moment Guthrie's explanation that these acts were performed for the purpose of deluding and defrauding an insurance company, it seems that the parties used an unusual and unorthodox method to demonstrate that the loss of the automobile was a result of foul play. The jury heard and saw Guthrie on the witness stand and heard his testimony in the Weller trial read by others in his own trial. Not only is his explanation somewhat harpooned by its unorthodox nature, but his credibility is further somewhat watered down by proof of a prior conviction of burglary. Men and women as jurors are not required to believe as jurors that which they would disbelieve as ordinary reasonable citizens. Applying this test to the facts in this case, it is our judgment that there is sufficient evidence in this record to support a jury verdict either of murder or of involuntary manslaughter. It is not our province to determine which verdict is proper. It is for the jury to make the choice between two different concepts or theories as to what crime this evidence actually discloses. It was error not to give them that choice and to give them

that choice by the submission of an involuntary manslaughter verdict together with an explanation of the legal principles involved in involuntary manslaughter. There is evidence in this case which, if believed by the jury, would warrant a conviction of involuntary manslaughter. The failure to submit the issue to the jury requires a new trial. People v. Canada, 26 Ill2d 491, 187 NE2d 243; People v. McCrory, 25 Ill2d 213, 184 NE2d 846; People v. Harris, 8 Ill2d 431, 134 NE2d 315.

In view of our holding in this case, other errors assigned such as denial of a continuance, denial of a change of venue, newspaper publicity, and closing arguments of the State's Attorney are matters not likely to recur on a subsequent trial and require no discussion.

We took with this case a motion to transfer it to the Supreme Court because of constitutional questions raised. In view of our holding, that motion is denied and the judgment of the trial court is reversed and the cause remanded for new trial in accordance with the views herein expressed.

Reversed and remanded.

TRAPP and RICHARDS, JJ., concur.