(No. 56192.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DeWAYNE MOORE, Appellee.

*Opinion filed March 25, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and David A. Shapiro, Assistant State's Attorneys, of counsel), for the People.

Steven Clark, Deputy Defender, of the Office of the State Appellate Defender, of Chicago (Shelly B. Kulwin and Silets & Martin, Ltd., of counsel), for appellee.

JUSTICE WARD delivered the opinion of the court:

DeWayne Moore was convicted of murder, armed robbery and armed violence after a jury trial in the circuit court of Cook County. He was sentenced to concurrent terms of 40 years for murder and 15 years for each of the other offenses. The appellate court, with one justice dissenting, reversed the judgment of the circuit court and remanded the cause for a new trial, on the ground that it was reversible error for the trial court to refuse to give a voluntary-manslaughter instruction that the defendant had tendered. (102 Ill. App. 3d 651.) We allowed the State's petition for leave to appeal under Rule 315 (73 Ill. 2d R. 315).

At the trial, Mrs. Bok Kim testified through a Korean interpreter that she was the wife of Chong Kim, who owned the Sun Wig Shop in Chicago. She said that on November 24, 1978, at about 4 p.m., she was working in the store while her husband, her three young children and her brother-in-law were in the back room. The defendant entered the store and she waited on him. While she was waiting on him, three other customers came in, and her brother-in-law, Hun Chong Kim, came from the back room and assisted them. Two more customers entered, but soon all of the customers had left the store except the defendant, who was inquiring about necklaces and sunglasses. The defendant then told the brother-in-law to stand aside, and drew a gun from his coat pocket. The defendant took jewelry from the showcases. Mrs. Kim allowed him to take the merchandise, but then grabbed his arm from behind, struggled with him, and called to her husband for help. When her husband came from the back room, the defendant shot him from a distance of five or six feet. As Mr. Kim fell forward, he grabbed the defendant's arm and the defendant fired again. Mrs. Kim shouted for help, and two passersby came in the store and held the defendant until po-

lice arrived moments later.

Hun Chong Kim testified through an interpreter that he first saw the defendant when his sister-in-law called him from the back room to assist customers. He said that the defendant drew a gun and, after threatening Mrs. Kim and him, pushed him aside and took jewelry from the showcase. Mrs. Kim called for help and when her husband responded, the defendant fired at him from a distance of five or six feet. Hun Chong Kim said that two shots were fired. Neither his brother nor his sister-in-law had touched the gun.

Chicago police officers Ronald Mainellis and Mary Dahl testified that while on patrol they were flagged down by a man who told them that a man in the Kims' store had a gun. As they pulled up in front of the store, the victim, who was bleeding, told them that he had been shot. Officer Dahl radioed for assistance, while Officer Mainellis entered the store, where he saw the defendant struggling with Mrs. Kim and two men. Mrs. Kim told him that the defendant had shot her husband.

The defendant was handcuffed and placed in the squad car. Officer Dahl attended to the victim and asked him if the defendant had shot him. The victim said yes. A young boy handed Officer Mainellis a gun the boy had found in the store's doorway area. At the police station, a search of the defendant produced four necklaces, three watches, three rings, two bracelets, a cigarette lighter, automobile keys and $3.35.

Mr. Kim died of his wound. Dr. Robert J. Stein, chief medical examiner of Cook County, testified that an autopsy showed that the cause of death was a bullet wound to the abdomen, which also involved the lung, liver and spleen. Dr. Stein examined the victim's clothes but did not detect powder burns or stipplings round the bullet hole in the fabric.

Donald Gunnell, a technician of the Chicago police de-

partment criminalistics division, testified that he examined the pistol recovered at the scene. His opinion was that a bullet recovered from Mr. Kim's body was fired from the weapon, and that two expended cartridges found in the store had been fired from the gun.

Officer Robert Bunk testified that he observed an automobile illegally parked in an alley behind 3529 South Halsted Street. (The address of the Sun Wig Shop was 3515 South Halsted Street, and the defendant did not live in the vicinity of the shop.) Officer Bunk testified that a vehicle check revealed that the car was registered to the defendant. Officer Bunk said that a set of keys taken from the defendant that Bunk received from Officer Mainellis at the police station fit the auto's locks.

The defendant testified and claimed that the People's witnesses had lied. He said that when he entered the store he already had the jewelry found on his person at the police station. He said that he did not have a gun when he entered the store. In the store, he testified, he spoke with Mrs. Kim about having his initials inscribed upon a cigarette lighter he owned. She agreed to put the initials on the lighter without charge if he would purchase a pair of sunglasses, he testified, and he was leaving to get the cigarette lighter from his car when Mrs. Kim held him and began screaming in Korean. The defendant said that Mr. Kim then came from the back room with a gun in his hand and approached the defendant. According to the defendant, he and Mr. Kim then struggled. The defendant tried to knock the gun from Kim's hand, fearing that he would be shot, but the gun went off twice while in Kim's hand. The defendant also said that he had parked his car at a curb on Halsted Street, not in an alley.

Officer Thomas Quinn testified that he was assigned to investigate the killing of Mr. Kim. He related that the defendant spoke to him about the killing after he had

given the defendant *Miranda* warnings. According to Quinn, the defendant said that he entered the store with the loaded gun, which he had found in an alley the previous day. The defendant told the officer that he did not intend to shoot Kim, but did so accidentally during his struggle to get out of the store. The defendant said that he had gotten the idea for the robbery from a television program.

The defendant had been charged by information with murder (including felony murder), armed robbery and armed violence. The jury was instructed as to each offense. The trial court refused, however, to give an instruction on voluntary manslaughter tendered by the defendant, but it did give an instruction on the justifiable use of force. The State had objected to the voluntary-manslaughter instruction on the ground that it involved intentional or knowing killing, and the defendant's theory was that the killing was accidental. The court said in refusing the instruction that the evidence did "not lend itself to voluntary manslaughter *** ."

As has been stated, the appellate court reversed the conviction on the ground that the trial court erred in refusing to give the voluntary-manslaughter instruction. The court noted that the instruction on the justifiable use of force was given, and that section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b)) provides that one who intentionally or knowingly kills commits voluntary manslaughter if at the time of the killing he unreasonably believes the circumstances to be such that, if they existed, would justify or exonerate the killing. The court concluded:

> "After carefully reviewing the record, we believe that the trial court erred in refusing the tendered instruction. The jury could have concluded from all the evidence before it, despite some inconsistencies in defendant's testimony, that defendant killed Kim in the unreasonable be-

lief that he was justified in doing so. Since the evidence was conflicting, it was for the jury, with the benefit of proper instructions, to decide whether the killing was murder or manslaughter or justified as self-defense. [Citation.] We, therefore, must reverse and remand this cause for a new trial." 102 Ill. App. 3d 651, 661.

We judge that the appellate court erred in reversing the conviction. We need not decide whether the trial court should have given the instruction, because, as the dissenting justice in the appellate court observed (102 Ill. App. 3d 651, 661-62, it is clear that if it was error, it was harmless error.

A refusal to give an instruction will be held to be harmless and not a ground for reversal where it can be said that the result of the trial would not have been different if the instruction had been given. *People v. Diekelmann* (1937), 367 Ill. 372, 387; *e.g., People v. Davis* (1957), 10 Ill. 2d 430, 443, *cert. denied* (1957), 355 U.S. 820, 2 L. Ed. 2d 35, 78 S. Ct. 25 ("[E]rror in the giving or refusing of instructions will not, alone, justify a reversal when the evidence of the defendant's guilt is so clear and convincing, as it was in the case at bar, that a jury could not reasonably have found the defendant not guilty"); *People v. Nathanson* (1945), 389 Ill. 311, 319, *cert. denied* (1945), 325 U.S. 872, 89 L. Ed. 1990, 65 S. Ct. 1412 (a refused cautionary accomplice instruction "could well have been given," however, the failure to give it was not prejudicial).

Here the defendant was charged and the jury was instructed under the felony-murder rule embodied in section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). That section provides in part:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) *He is attempting or committing a forcible felony* other than voluntary manslaughter." (Emphasis added.)

To be convicted of murder under the felony-murder doctrine, the accused need not have intended to kill. (*People v. Trinkle* (1977), 68 Ill. 2d 198, 202; *People v. Viser* (1975), 62 Ill. 2d 568, 582.) Too, self-defense cannot be used as a defense to a charge of felony murder. (*People v. Baker* (1978), 57 Ill. App. 3d 401.) In section 7—4 (Ill. Rev. Stat. 1977, ch. 38, par. 7—4), the Code provides: "The justification [of the use of force in defense of person and property] described in the preceding Sections of this Article is not available to a person who: (a) Is attempting to commit, committing, or escaping after the commission of, a forcible felony; \*\*\*."

The jury, acting on the overwhelming weight of the evidence, found the defendant guilty of armed robbery, a forcible felony. Under those circumstances it made no difference whether the defendant killed the victim knowingly or intentionally but with an unreasonable belief that the killing was justified as self-defense. Even with an instruction as to voluntary manslaughter, the jury, acting on the clear evidence that the defendant was committing a forcible felony, could not have convicted the defendant of less than murder. (See *People v. Payne* (1935), 359 Ill. 246 (where the deceased was shot during an attempted robbery, the refusal to give a manslaughter instruction was proper, in view of the statutory provision that where the killing is committed in the prosecution of a felonious intent, the crime is murder); *People v. Weathers* (1974), 18 Ill. App. 3d 338 (where the defendant admitted participation in a planned armed robbery, and where the State charged him under the felony-murder statute, it would have been impossible for the jury to have found the defendant guilty of

manslaughter or reckless conduct and the instruction thereon was properly refused).) Any possible error in failing to give the instruction on the offense of voluntary manslaughter, therefore, was not a ground for reversing the conviction.

For the reasons given, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*