THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK A. SLOAN, Defendant-Appellant.

Fourth District   No. 4—83—0561

Opinion filed November 15, 1984.—Rehearing denied January 8, 1985.

MILLS, P.J., dissenting.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE TRAPP delivered the opinion of the court:

Following a jury trial, defendant Mark Sloan was convicted of murder and home invasion and sentenced to 40 years' imprisonment. On appeal, defendant argues that: (1) the trial court erred in refusing his instructions on voluntary manslaughter and self-defense; (2) his conviction must be reversed because no involuntary manslaughter instruction was tendered or given; and (3) the trial court abused its discretion in sentencing him without fully considering his potential for rehabilitation. In view of our disposition of the first issue, we need not address defendant's other arguments.

At about 2 a.m. on January 13, 1983, defendant went to the home of his former girlfriend, Cynthia Johnson, armed with a sawed-off shotgun. After knocking on the door for 10 to 15 minutes, defendant forcibly entered the residence. Cynthia, her new boyfriend, Rick Wilson, her roommate, Wanda Johnson, and Cynthia and defendant's baby were already inside. Wilson and defendant exchanged words, and then defendant shot and killed Wilson.

The week before the shooting, on January 7, defendant and Wilson fought at a party. Cynthia, Wanda, and defendant's girlfriend, DeAnn Mottley, were also at the party. The witnesses gave different versions of the fight. Defendant maintains that Wilson and his friends ganged up on defendant, and either Wilson or his friend, Fitzgerald Clay, cut defendant on the arm with a knife. Cynthia testified that defendant and Wilson started to argue, and defendant took a swing at Wilson. Cynthia saw no more of the fight; however, she later determined Wilson had won. Mottley testified Wilson and his friends ganged up on the defendant, kicked him, and made him wet his pants. On the way home, she noticed a two- to three-inch cut on defendant's arm. Later that evening, Wilson, his friends, Cynthia, and Wanda went to Mottley's house looking for defendant. Wilson threatened to kill defendant with a gun.

On January 13, defendant asked Mottley if he could borrow her car

to go to Cynthia's home and check on his baby. He brought the sawed-off shotgun with him. At trial, defendant testified that he hid the gun under his coat and knocked on Cynthia's door. After 10 to 15 minutes, he pushed the door open. He saw Wilson sitting in the bedroom and asked why Wilson and his friends had jumped defendant at the party. Wilson replied he would kill defendant the next time. Defendant stated he was not there to argue and started toward the other bedroom. Wilson then rushed at defendant, who turned and brought out the gun. As Wilson dared defendant to shoot, defendant stumbled, and the gun discharged.

Defendant also testified he was afraid of Wilson because Wilson had beaten and cut him. Defendant thought Wilson was going to attack him. He was scared and could not tell if Wilson had anything in his hands. The front room light was dimmed, and only the television was on in the bedroom. Defendant asserted he did not intend to shoot or kill Wilson. Defendant testified he brought the gun only to protect himself. He denied kicking in the door. He further denied threatening either Cynthia or Wanda.

According to Cynthia, defendant stated he had come to see his baby when he knocked on her door. Cynthia told Wilson to go into the bedroom and shut the door because she did not want a fight in her house. Cynthia took her baby and hid in Wanda's room because she was scared. She then heard defendant kick down the door. Wilson and defendant began to argue about their previous fight. At one point, defendant stated, "Shut up, your time is going to come now." Wilson continued to argue, and Cynthia heard a gunshot. Defendant then said, "Cynthia, put my baby down because you're next. And Wanda, if you're in there, I got a bullet for you too." Cynthia entered the living room and saw defendant holding the gun. He fled, and she called the police.

Cynthia believed defendant had come just to see his baby. She also believed he did not know Wilson was present because Wilson's car was not parked in front of her house. She stated she knew Wilson had carried a gun in the past, but he was unarmed that night.

Wanda's testimony was almost identical to Cynthia's. According to Wanda, defendant stated he wanted to see his baby as he knocked. She also heard defendant kick in the door. Wilson and defendant argued about their previous fight, and at one point, defendant told Wilson his time would come sooner or later. The argument continued until Wanda heard the shot. Defendant then threatened to kill both Wanda and Cynthia.

The police investigated and found the door casing lying on the floor

and Wilson dead. They arrested defendant at Mottley's house. At trial, the jury heard a tape-recording of defendant's statement to police. Defendant stated four or five individuals jumped him at a party on January 7. He claimed either Wilson or Clay cut him with a knife. On January 13, defendant was thinking about the fight. He decided to go to Cynthia's house to see if Wilson was there and to "take care of the problems." After beating on Cynthia's door, defendant pushed and it came open because it was already damaged. He saw Wilson and asked him what he was doing there. Wilson replied it was none of defendant's business. Defendant then pulled out the gun and Wilson dared him to shoot. The two exchanged words until Wilson jumped up to rush at defendant, and defendant shot Wilson. Cynthia came out of the bedroom, and defendant asked her if the baby was all right. He then fled.

At the instructions conference, defendant tendered instructions on voluntary manslaughter and self-defense. The judge refused to give the jury either instruction. The judge reasoned that it would be preposterous to give the voluntary manslaughter instruction merely because the lighting was bad and defendant could not tell if Wilson was armed. The court also held Wilson was entitled to use deadly force to repel the tumultuous invasion of the residence. Defendant, therefore, had no right to assert self-defense in killing Wilson.

■ In homicide cases, if there is any evidence in the record which, if believed by the jury, would reduce a crime to manslaughter or support an affirmative defense, then instructions defining manslaughter and the defense should be given if requested. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34; *People v. Joyner* (1972), 50 Ill. 2d 302, 306, 278 N.E.2d 756, 759.) Only very slight evidence on a given theory is required to entitle defendant to an instruction on that theory. *People v. Cookson* (1982), 108 Ill. App. 3d 861, 865, 439 N.E.2d 1033, 1036.

The State first contends defendant was precluded from asserting self-defense or voluntary manslaughter as a matter of law. The State asserts section 7—2 of the Criminal Code of 1961 allowed Wilson to use force against defendant. (Ill. Rev. Stat. 1981, ch. 38, par. 7—2.) That section provides, in part:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling."

The State concludes defendant may not now assert self-defense in killing Wilson when Wilson justifiably used force.

The State cannot pretend Wilson was protecting the residence. Its

own witnesses testified Wilson and defendant argued about their previous fight and not about defendant's entry into the residence. According to the witnesses, Wilson never ordered defendant to leave, but instead stated defendant could see his child.

Moreover, defendant maintains he acted with a belief that Wilson was using deadly force. The State contends section 7—2 allowed Wilson to use deadly force. That section justifies a person's use of deadly force to terminate another's unlawful entry only if:

"(a) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling." Ill. Rev. Stat. 1981, ch. 38, par. 7—2(a).

■ While defendant concedes his entry was tumultuous, he asserts Wilson could not have reasonably believed deadly force was necessary. Defendant's evidence revealed he entered merely to see his child, and Wilson knew of this purpose. According to defendant's trial testimony, Wilson made the first offer of personal violence. Considering the conflicting testimony, the jury should have decided whether Wilson could have used deadly force. (*People v. Stombaugh* (1972), 52 Ill. 2d 130, 138, 284 N.E.2d 640, 644.) Instead, the trial court decided the issue when it refused to instruct the jury on self-defense.

■ The State complains that Wilson was unarmed; therefore, he could not have used deadly force. However, the defendant's perception, rather than the actual peril, is dispositive of the self-defense and voluntary manslaughter claims. *People v. Shipp* (1977), 52 Ill. App. 3d 470, 476, 367 N.E.2d 966, 970.

The State also argues section 7—4 precludes defendant from asserting self-defense or voluntary manslaughter. (Ill. Rev. Stat. 1981, ch. 38, par. 7—4.) Under that section, self-defense is not available to a person who: "(a) Is attempting to commit, committing, or escaping after the commission of, a forcible felony." Besides murder, defendant was charged with and convicted of home invasion, a forcible felony, because he entered Cynthia's dwelling when he knew someone was present, and he intentionally injured Wilson.

In *People v. Moore* (1983), 95 Ill. 2d 404, 447 N.E.2d 1327, defendant contended the refusal to instruct on voluntary manslaughter was error. The supreme court affirmed his conviction for felony murder, holding any error was harmless. Besides felony murder, the jury also found defendant guilty of armed robbery, a forcible felony. The court declared that even with a voluntary manslaughter instruction, the jury could not have convicted defendant of less than murder because they

found defendant guilty of a forcible felony. Therefore, whether defendant killed the victim intentionally or knowingly but with an unreasonable belief that the killing was justified made no difference. 95 Ill. 2d 404, 411, 447 N.E.2d 1327, 1331.

■ Unlike *Moore*, defendant here was not charged with felony murder. He could, therefore, assert self-defense. Also, his conviction for the forcible felony rested upon the jury's finding that he intentionally injured Wilson. Defendant's self-defense claim, if believed by the jury, would not only protect him from the murder charge, but would also protect him from the forcible felony charge. Whether defendant killed Wilson with the belief that the killing was justified, therefore, made a difference in the result.

■ The State further maintains that defendant could not justifiably use force because he was the aggressor. Certainly, the State's evidence indicated defendant threatened Wilson and pulled out the gun before Wilson made any threatening moves. On the other hand, defendant testified Wilson threatened him and charged at him before he removed the gun from under his coat. Where the facts are in dispute, the question of whether defendant was the aggressor should be left for the jury to resolve. *People v. Harris* (1976), 39 Ill. App. 3d 805, 812, 350 N.E.2d 850, 856.

Finally, the State contends the record contains no evidence to support a self-defense or voluntary manslaughter theory. At trial, defendant stated he accidentally shot Wilson. Because defendant maintained he did not intend to shoot, the State concludes he could not have acted with a belief that deadly force was necessary. To prove murder, however, the State had to prove defendant intended to shoot. While the jury was allowed to decide this issue, they were not allowed to decide if defendant's intent was due to a subjective fear of great bodily harm.

■ A voluntary manslaughter or self-defense instruction may be proper even when defendant testified the death resulted from an accident. (*People v. Minnis* (1983), 118 Ill. App. 3d 345, 455 N.E.2d 209.) Defendant is entitled to any defense disclosed by the record, even a defense based upon facts that are inconsistent with his own testimony. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31, 34.) The trial court can charge the jury with inconsistent defenses so long as the facts and nature of the case support the feasibility of those defenses. *People v. Cruz* (1978), 66 Ill. App. 3d 760, 764, 384 N.E.2d 137, 139.

■ ■ The record contained some evidence to support the voluntary manslaughter and self-defense theories. Although the evidence consists mainly of defendant's self-serving testimony, which was contradicted by his claim that the shooting was accidental and his state-

ments to police, the credibility of his testimony was a matter for the jury to decide. (*People v. Harris* (1976), 39 Ill. App. 3d 805, 812, 350 N.E.2d 850, 854.) In order to decide that the trial would not have reached a different result had instructions on voluntary manslaughter and self-defense been given (*People v. Moore* (1983), 95 Ill. 2d 404, 410, 447 N.E.2d 1327, 1330), we would have to invade the province of the jury. We will not do so, and the trial court erred when it did so. *People v. Papas* (1942), 381 Ill. 90, 96, 44 N.E.2d 896, 898; *People v. Guthrie* (1970), 123 Ill. App. 2d 407, 413, 258 N.E.2d 802, 805.

For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

GREEN, J., concurs.

PRESIDING JUSTICE MILLS, dissenting:

The majority reads "any evidence" entirely too literally. "Any" evidence must at least be believable and possess some color of plausibility.

Defendant and the victim had a fight.

Defendant came off second best.

Six days later—at 2 a.m.—defendant went to the residence of his former girlfriend, who was now keeping company with the victim.

In his statement to the police, defendant said he went to his former girlfriend's house to see if the victim was there and to "take care of the problems."

He carried a sawed-off shotgun.

He knocked on the front door for 15 minutes, but she didn't open the door.

He kicked the door down.

The victim was there and defendant told him that his time was "going to come now."

He shot the victim.

And he yelled out to the former girlfriend to "put my baby down because you're next."

He also yelled, "Wanda, if you're in there, I got a bullet for you, too."

Can a defendant under these circumstances claim self-defense and voluntary manslaughter?

Nonsense.

I dissent.