# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Brown, 2013 IL App (3d) 110669**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID BROWN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0669 |
| Filed | June 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for felony murder and unlawful possession of a firearm by a felon were upheld over his contentions that the trial court erred in refusing to give instructions on self-defense or second degree murder and in allowing the State to impeach defendant with a prior conviction, since any error in refusing the instructions was harmless beyond a reasonable doubt and defendant waived his objection to the impeachment, the evidence of his guilt was overwhelming, and the evidence of the prior conviction was not outcome determinative; however, certain fees and fines were modified to comply with the applicable statutes. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 09-CF-1336; the Hon. Stephen Kouri, Judge, presiding. |
| Judgment | Affirmed as modified. |

Counsel on
Appeal

Sean Conley (argued), of State Appellate Defender's Office, of Ottawa,
for appellant.

Jerry Brady, State's Attorney, of Peoria (Terry A. Mertel and Richard T.
Leonard (argued), both of State's Attorneys Appellate Prosecutor's
Office, of counsel), for the People.

Panel

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Holdridge and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1    Following trial, a jury found defendant, David Brown, guilty of armed robbery, unlawful possession of a firearm by a felon, intentional murder, and felony murder. The circuit court of Peoria County entered judgment on the felony murder count, as well as the unlawful possession of a firearm by a felon count, sentencing him to natural life for the former and 14 years in prison for the latter. Defendant appeals, claiming the trial court erred: (1) in refusing to instruct the jury as to self-defense; (2) in allowing the State to impeach defendant with a prior conviction; and (3) in assessing $2,444.50 in fees. We affirm defendant's convictions, but modify the assessment of certain fines and fees.

¶ 2                            BACKGROUND

¶ 3    Defendant shot and killed Johnny Whitehead on December 1, 2009. When police officers arrived on the scene, he shot at the officers and attempted to flee. Following his apprehension, the State indicted defendant for numerous crimes associated with the incident.

¶ 4    The seven-count indictment, filed December 8, 2009, accuses defendant of: (1) felony murder (720 ILCS 5/9-1(a)(3) (West 2008)) for killing Johnny Whitehead without legal justification during the commission of armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)); (2) first degree murder for shooting Johnny Whitehead with the intent to kill (720 ILCS 5/9-1(a)(1) (West 2008)); (3) aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(3) (West 2008)) for discharging a firearm in the direction of a peace officer; (4) armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)) for taking currency from Johnny Whitehead by threatening the imminent use of force while armed with a handgun; (5) armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)) for taking currency from Daisy Whitehead by threatening the imminent use of force while armed with a handgun; (6) home invasion (720 ILCS 5/12-11(a)(3) (West 2008)) for intentionally using force, which caused great bodily harm against Johnny Whitehead after entering his dwelling while armed with a handgun and having reason to

know someone was present; and (7) unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2008)).

¶ 5    Prior to trial, defendant indicated that he wanted to represent himself. The trial court granted defendant's request to proceed *pro se* and the trial commenced.

¶ 6    Daisy Whitehead testified that on December 1, 2009, she lived with her son, Johnny, and grandson. She left their apartment around 8 a.m., but realized she forgot her phone in the apartment. Walking out of her apartment after retrieving her phone, she was struck in the stomach and told to go back into the apartment by defendant. She took defendant into a bedroom where Johnny was talking on the phone. Defendant, armed with a handgun, ordered Johnny to hang up the phone and demanded money while threatening to kill Daisy. Defendant then took an unspecified amount of money from Johnny, as well as Daisy's coin purse, which contained approximately $100. Someone knocked on the door. Johnny told defendant it was the police knocking. Defendant went to answer the door. Once he left the bedroom, Johnny closed the door and told Daisy to get a phone, but she could not find one. Daisy then heard six gunshots. Johnny then fell through the bedroom door, knocking it off its hinges. Daisy then heard four more gunshots, followed by defendant's reentry into the bedroom. Defendant ran across the bedroom and jumped out the window. Daisy walked out the front door, passing Johnny, who was facedown, bleeding and unresponsive. Once outside, Daisy observed defendant come around a corner of the building and she heard more gunshots.

¶ 7    The defendant began his cross-examination of Daisy by informing her that he "can't begin to express the amount of regret" he has for the incident. During cross-examination, Daisy reiterated that the shots, which killed her son, came through the closed bedroom door.

¶ 8    Angela Blue testified that she was Johnny's fiancée; she was on the phone with him when she heard a male's voice tell Johnny to put his hands up. She heard Johnny tell the man not to shoot and to take whatever he wanted. She asked Johnny to tell her whom he was talking to, but Johnny did not answer. She then called 911 and rushed over to the apartment with her son. She knocked on the door to the apartment, but received no response.

¶ 9    Angela stated that she witnessed two officers approach, so she explained what she knew. One of the officers knocked on the door and stepped up a short flight of stairs to one side. A voice answered "Who is it?" then defendant opened the door holding a gun. Defendant pointed the gun at Angela and ordered her into the apartment. The officer told defendant to "Freeze, don't move," but defendant lifted his gun. The officer fired shots at defendant. Defendant fired shots back at the officer. Angela, her son, and a second officer ran back into the parking lot. While running, she heard four more shots.

¶ 10    Angela then called 911 for a second time from the parking lot to tell the operator about the shooting. More police arrived shortly and she observed defendant come around the side of the apartment building. She yelled, "That's him." Nearby officers ordered defendant to freeze, but defendant fired at them.

¶ 11    Officer Calvin Jones testified that he was dispatched to the apartment complex for a suspected home invasion in progress. The original address given was incorrect. Upon arrival, he made contact with Angela, who led him to the correct apartment. When defendant

answered the door, Jones yelled "Gun." Defendant fired twice filling the breezeway with smoke.

¶ 12    Officer Jones then alerted Officer Hill to the scenario, after which time Hill took a defensive position atop the breezeway stairs. Jones heard two to three more shots inside the apartment, then he witnessed defendant come around the side of the building with gun still in hand. Defendant raised his gun; Jones fired at defendant; defendant retreated around the side of the building.

¶ 13    Officer Hill testified that he and Officer Jones were dispatched to the building for a home invasion in progress. Hill's testimony substantially mirrored Jones's testimony. Hill also observed defendant making a "shh'ing" gesture toward Angela and her son.

¶ 14    Lieutenant Mike White testified that he responded to the apartment complex as commander of the special response team. Dispatch informed White that it was in contact with someone inside the apartment named David, who wanted to come out. White talked to David, who claimed he was bleeding from the jaw. White led a team into the apartment, where they found a man unresponsive on the floor. Blood pooled underneath the man and a gun lay nearby.

¶ 15    Detective Matt Ray testified regarding a videotaped "walk-through" of the area. The State played the videotape for the jury. Ray noted the videotape failed to show any shell casings outside the front door of the apartment.

¶ 16    Officer Javier Grow testified that he helped secure the apartment. He immediately saw the decedent lying facedown with a gun next to the decedent's head. Grow kicked the gun away. One of the bedroom doors was off its hinges and on the ground. Grow used a pair of diagrams to show the layout of the apartment and describe where he found certain forensic evidence. Five shell casings were found in the apartment, including two underneath the victim's body.

¶ 17    Eric Ellis testified that he is a member of the crime scene unit. He gathered physical evidence from the scene. He collected Officer Jones's service weapon and the handgun from inside the apartment. Ellis described: a .40-caliber shell casing found outside the apartment building; blood on the outside of the ground floor window; a scuff mark in the dirt outside the apartment; .380-caliber shell casings found inside the apartment; damage to the fallen bedroom door; copper jacketing of a bullet that fell out of a bloody sweatshirt inside the apartment; and the lead core of a bullet found inside the apartment. Ellis acknowledged that a substance found inside a shoe in the apartment appeared to be crack cocaine, but he was not involved in the testing of that substance.

¶ 18    Other evidence admitted during trial indicated that four bullets recovered from the decedent's body were fired from the CZ Makarov handgun recovered at the scene. The .40-caliber shell casing found outside the building came from Officer Jones's service weapon.

¶ 19    Officer Steve Garner testified that he rode in the ambulance transporting defendant following the incident. Paramedics retrieved a purse containing money from defendant's pocket. The money from defendant's pocket and from the purse totaled $729.14. Garner took a picture of Daisy holding the coin purse later at the police department.

-4-

¶ 20    Yohni Brown testified that she and defendant have a son together. On the day of the incident, she called defendant to ask him to take her to work to pick up a check and then watch their son. When defendant arrived, he told Yohni to drive and directed her to the Timberlane Apartments. Yohni noted the two went there to buy marijuana. Defendant went inside, then called her a few minutes later asking her to come inside as well. Once inside, Yohni saw that defendant had a gun and thought that he was committing a robbery.

¶ 21    Once inside the apartment, Yohni witnessed a woman praying while a man said, "You want to take something, take it and go." Defendant waived the gun at the two in the apartment and instructed Yohni to go through the clothes, which she did. Yohni subsequently pled guilty to armed robbery and received an 18-year sentence.

¶ 22    Defendant testified in his own defense, claiming that two days prior to the incident, he gave Johnny money for cocaine and marijuana. Normally, defendant would give Johnny money for a drug transaction, then receive a call in a few days to come retrieve the drugs. Since he received no call this time, he went to the apartment to inquire about the transaction.

¶ 23    Defendant claimed that when arriving at the apartment, he encountered Daisy exiting and informed her he was there to discuss money that Johnny owed him. Daisy then led defendant into Johnny's bedroom, where the three argued over money until Johnny pulled a gun. Upon seeing Johnny's gun, defendant ran, closing the bedroom door behind him. The door came off the hinges as Johnny and the defendant struggled.

¶ 24    Defendant further testified that he managed to grab the gun from Johnny's hand, which changed Johnny's demeanor. Johnny offered defendant a television and other items, yet defendant was only interested in drugs or money. He instructed Yohni to come into the house to search for either. The argument continued until Johnny instructed Daisy to give defendant her coin purse.

¶ 25    Defendant stated that he next heard a knock at the door so he opened it to find Angela. He knew Angela participated in Johnny's drug dealing so he invited her into the apartment. When Angela stepped back from the door, defendant saw a police officer with a gun. Realizing that he was also holding a gun, defendant jumped back and slammed the door. Defendant's gun discharged toward the ceiling when the door slammed. Upon turning around, defendant observed Johnny charging at him. Thinking it odd that someone would charge an armed man, defendant surmised that Johnny must also be armed so he pointed the gun at Johnny and instructed Johnny to cease the attack. Johnny continued advancing, which defendant stated scared him.

¶ 26    Defendant noted that he did not want to shoot Johnny. The two made contact and struggled, during which time Johnny pushed defendant into a glass table. Believing he was about to be overpowered, defendant closed his eyes and started firing. Thereafter, he panicked and fled out the bedroom window where he encountered officers with guns drawn. One officer fired, hitting defendant. Defendant retreated, reentering the apartment through the same bedroom window.

¶ 27    Defendant testified that when he reentered the apartment, his face was numb so he searched for something to stop the bleeding. Still in a panic, he made several phone calls to family and 911. Eventually, since police assured him he would not be harmed again, he

exited the apartment and was placed in an ambulance.

¶ 28    During cross-examination, defendant indicated that he had no weapon upon arrival at the apartment. The sole purpose for his visit was to seek a refund or, in the alternative, the drugs for which he paid two days prior. Even after disarming Johnny and coming into possession of the handgun, defendant repeated his pleas for either the drugs or a return of his advance. Defendant claimed that at no time did he ever demand Johnny's money, a television set, or other items. He did not seek law enforcement assistance given his status as a known felon. Moreover, immediately after the shooting, he did not contemplate relinquishing possession of the gun, as he was consumed with thoughts of fleeing.

¶ 29    Defendant called Officer Garner back to the stand. The officer testified that ballistics matched the gun used to kill Johnny with a July of 2009 homicide. Officer Garner noted that defendant was incarcerated in July of 2009. The defense rested after Garner's testimony.

¶ 30    In rebuttal, the State asked to introduce evidence of the defendant's prior conviction to impeach his credibility. Over defendant's objection, the trial court allowed the State to introduce the evidence. The trial court also allowed defendant to introduce evidence of Yohni's two prior convictions.

¶ 31    At the instructions conference, defendant asked for a mitigating instruction, as well as a lesser-included-offense instruction. Specifically, the defendant requested an instruction on self-defense and second degree murder. The trial court refused defendant's requests.

¶ 32    The jury returned guilty verdicts for armed robbery, unlawful possession of a firearm by a felon, and both intentional first degree murder and first degree felony murder. The jury acquitted defendant of home invasion and aggravated discharge of a firearm.

¶ 33    The trial court entered judgment only on the felony murder conviction and the unlawful possession of a firearm by a felon conviction, sentencing defendant, respectively, to natural life in prison and 14 years' incarceration. The trial court also ordered defendant to pay $2,444.50 in fees. Defendant made an oral motion to reconsider that was denied. This appeal followed.

¶ 34                                              ANALYSIS

¶ 35    Defendant raises three issues on appeal. Initially the defendant contends that the trial court erred when refusing to instruct the jury on self-defense and second degree murder. Next, defendant asserts that the trial court erred by allowing the State to introduce evidence of defendant's prior conviction for impeachment purposes. Finally, defendant asserts that the trial court erred in assessing certain fees against him, namely: the $200 deoxyribonucleic acid (DNA) analysis fee; the $100 public defender fee; the $530 State's Attorney fee; and the Violent Crime Victims Assistance Fund fee. Defendant takes no issue with other fees assessed against him.

¶ 36                                        I. Jury Instructions

¶ 37    Noting that the State charged him with intentional first degree murder, as well as first degree felony murder, defendant argues that given the evidence adduced at trial, he was

-6-

entitled to have the jury instructed on both self-defense and second degree murder. Defendant claims his testimony indicated that he was in fear for his life when he shot Johnny Whitehead. As such, defendant argues he is entitled to both a self-defense instruction and a lesser-included-offense instruction; that being second degree murder.

¶ 38    The State correctly notes this issue is forfeited. A defendant must make a timely objection and address the alleged error in a written posttrial motion to preserve the issue for review. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988). Defendant acknowledges that he failed to properly preserve this issue, yet asks us to review the matter for plain error. We find we need not review this matter under plain error, as there is no relief we can grant defendant even if we were to find that the trial court committed plain error when refusing the instruction.

¶ 39    The trial court entered judgment of conviction for only first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2008)) and unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2008)). As our supreme court has made clear, to "be convicted of murder under the felony-murder doctrine, the accused need not have intended to kill. [Citations.] Too, self-defense cannot be used as a defense to a charge of felony murder." *People v. Moore*, 95 Ill. 2d 404, 411 (1983).

¶ 40    *Moore* is strikingly similar to the case at bar. In *Moore*, the State's witnesses offered overwhelming testimony indicating the defendant committed an armed robbery of the victim's business. *Id.* at 406. Defendant testified that he went to the business with an innocent purpose, to have a lighter engraved, when one of the store's owners approached him with gun drawn. *Id.* at 408. The *Moore* defendant continued that in an ensuing struggle, the gun discharged killing someone in the store. *Id.* The appellate court reversed the *Moore* defendant's conviction "on the ground that the trial court erred in refusing to give the voluntary-manslaughter instruction." *Id.* at 409.

¶ 41    The *Moore* court reversed the appellate court, noting that the defendant's intent to kill is not relevant to a felony murder charge and further that "self-defense cannot be used as a defense to a charge of felony murder." *Id.* at 411. The court concluded, "The jury, acting on the overwhelming weight of the evidence, found the defendant guilty of armed robbery, a forcible felony. Under those circumstances it made no difference whether the defendant killed the victim knowingly or intentionally but with an unreasonable belief that the killing was justified as self-defense. *** Any possible error in failing to give the instruction on the offense of voluntary manslaughter, therefore, was not a ground for reversing the conviction." *Id.* at 411-12.

¶ 42    Similarly, we hold that even if the trial court committed error in refusing to give the self-defense or second degree murder instruction, such error is not grounds for reversing defendant's conviction for felony murder. Self-defense cannot be used as a defense to a charge of felony murder. *Id.* Moreover, the defendant's intent to kill is irrelevant to the charge of felony murder. Therefore, any error in refusing the instructions, plain or otherwise, is harmless beyond a reasonable doubt.

¶ 43                                    II. Prior Convictions

¶ 44        Defendant also argues that the trial court erred when allowing the State to admit evidence
of his prior conviction for aggravated battery with a firearm for impeachment purposes.
Again, the State argues defendant has forfeited this issue as he failed to raise it in a written
posttrial motion. Defendant acknowledges that he failed to properly preserve the issue, but
asks that we review the matter for plain error.

¶ 45        Where "a defendant fails to object to an error at trial and include the error in a posttrial
motion, he forfeits ordinary appellate review of that error." *People v. Johnson*, 238 Ill. 2d
478, 484 (2010). Under the plain-error doctrine, a reviewing court may consider a forfeited
error when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the
> error alone threatened to tip the scales of justice against the defendant, regardless of the
> seriousness of the error, or (2) a clear or obvious error occurred and that error is so
> serious that it affected the fairness of the defendant's trial and challenged the integrity
> of the judicial process, regardless of the closeness of the evidence." (Internal quotation
> marks omitted.) *Id.* at 484 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 46        Rather than operating as a general savings clause, the doctrine is construed as a narrow
and limited exception to the typical forfeiture rule applicable to unpreserved claims. *Id.* The
first step in plain-error analysis is to determine if any error occurred at all in the trial below.
*People v. Sargent*, 239 Ill. 2d 166,189-90 (2010). The burden of persuasion rests with the
defendant under both prongs of plain-error analysis. *Id.* The ultimate issue of whether a
forfeited claim is reviewable as plain error is a question of law that is reviewed *de novo*.
*Johnson*, 238 Ill. 2d at 485.

¶ 47        Defendant notes that our supreme court set forth factors in *People v. Montgomery*, 47 Ill.
2d 510 (1971), to be used by a trial court contemplating the introduction of a prior conviction
for impeachment purposes. The *Montgomery* court noted that evidence of a prior conviction
is relevant to attack the credibility of a witness if: the crime was punishable by death or more
than one year in prison, or the crime involved dishonesty or false statement regardless of the
punishment; less than 10 years elapsed since either the conviction or the release from
confinement; the probative value of the conviction outweighs the danger of unfair prejudice.
*Id.* at 518. This last factor requires a trial court to balance the nature of the prior conviction,
the temporal relation of the prior crime to the current charge, the subsequent career of the
witness, the length of the witness's criminal record, and whether the crime was similar to the
one charged. *People v. Mullins*, 242 Ill. 2d 1, 14-15 (2011).

¶ 48        Defendant asserts the record is devoid of any indication that the trial court actually
engaged in this balancing analysis. Therefore, defendant posits that he is entitled to have his
conviction reversed and the cause remanded for a new trial. No.

¶ 49        The record reveals that defendant asked the trial judge how his prior conviction was
relevant. The trial judge explained to defendant that "when you testify, when anybody
testifies, they have a right to ask the court to admit certain convictions that may bear on a
person's credibility." The trial judge stated that he was going to admit the prior conviction
over defendant's objection. The trial judge further stated that the jury would be given an

instruction informing the jury to consider the prior conviction only with regard to the issue of defendant's credibility. The record further indicates that the State argued that defendant's prior conviction satisfies the factors set out in *Montgomery*.

¶ 50 Defendant acknowledges that a trial court need not explicitly state that it is conducting the *Montgomery* balancing test. *Id.* at 16-19; *People v. Atkinson*, 186 Ill. 2d 450, 463 (1999). A trial judge is presumed to have understood the law and properly applied it. *People v. Howery*, 178 Ill. 2d 1, 32 (1997).

¶ 51 Again, the plain-error doctrine places the burden on the defendant to show that an error occurred. *Sargent*, 239 Ill. 2d at 189-90. Defendant has clearly failed to meet this burden. Defendant's sole argument "that balancing did not happen here" is based upon his belief that the record fails to specifically identify the trial court's acknowledgment of "either the need to conduct the balancing test or the actual application of the test." The trial court is under no duty to state its specific application of the test for the record. *Mullins*, 242 Ill. 2d at 14-15.

¶ 52 Here, even assuming error, defendant could not prevail on a plain-error argument. The evidence of defendant's guilt is overwhelming. No reasonable person could conclude that evidence of a prior conviction was outcome determinative. Defendant testified himself that he did not ask the police for help because of his prior felony convictions.

¶ 53                                  III. Fees

¶ 54 Finally, defendant claims that the trial court erred in calculating the amount of fees attributable to his convictions. Defendant argues that certain fees charged against him are not authorized by statute. The question of whether the trial court has authority to order a defendant to pay fees under any given statute is a question of statutory interpretation which we review *de novo*. *People v. Marshall*, 242 Ill. 2d 285, 292 (2011).

¶ 55 Defendant correctly notes, and the State acknowledges, that defendant's DNA was already on file due to a previous felony conviction and, as such, the trial court erred in ordering he be charged the $200 DNA analysis fee. *People v. Anthony*, 2011 IL App (1st) 091528-B. We agree and, therefore, vacate the part of the sentencing order imposing this fee.

¶ 56 Next, defendant asserts the trial court was without authority to order him to pay the $100 public defender fee. Defendant correctly notes that this fee is only authorized after a defendant has been given notice and has been afforded a hearing on his ability to pay. *People v. Gutierrez*, 2012 IL 111590; 725 ILCS 5/113-3.1(a) (West 2010). The record indicates the circuit clerk imposed this fee and that neither the State nor the trial court moved for the fee. In case anyone missed it, the supreme court has taken a strong stand against this practice: "We admonish the circuit clerks in general, and the Lake County circuit clerk in particular, that they may not impose public defender fees on their own. Pursuant to statute, a public defender fee may be imposed only by the circuit court after notice and a hearing on the defendant's ability to pay. We again remind the trial courts of their duty to hold such a hearing before imposing these fees, and we trust that we will not have to speak on this issue again." *Gutierrez*, 2012 IL 111590, ¶ 26. We vacate the public defender fee.

¶ 57 Defendant also argues that the State's Attorney fee authorized by section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2010)) should be reduced from $530 to $140.

-9-

The State concedes this argument as well. We agree. Section 4-2002 of the Counties Code entitles a State's Attorney to fees in certain designated amounts based upon specific characteristics of a given case. 55 ILCS 5/4-2002(a) (West 2010). The statute includes a *per diem*, but mandates that the trial court "shall make an order specifying the number of days for which said per diem shall be allowed." *Id.* We find no order in the record authorizing the *per diem* and, therefore, it may not be assessed. *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978). The remaining assessments authorized under section 4-2002(a) of the Counties Code equate to $140. 55 ILCS 5/4-2002(a) (West 2010).

¶ 58    Finally, the defendant acknowledges that the trial court miscalculated the Violent Crime Victims Assistance Fund fine. Section 10 of the Violent Crime Victims Assistance Act authorizes a fine of $4 for every $40 of other fines imposed. 725 ILCS 240/10(b) (West 2010). The only fines, as compared to fees, assessed by the trial court total $14.75. Therefore, the Violent Crime Victims Assistance Fund fee should be increased to $4.

¶ 59    Again, defendant takes no issue with the majority of the fees and fines assessed. After vacating the $200 DNA analysis fee and $100 public defender fee, reducing the State's Attorney fee from $530 to $140, and increasing the Violent Crime Victims Assistance Fund fee from $3 to $4, the total fees and fines owed by defendant equates to $1,755.50.

¶ 60                                    CONCLUSION

¶ 61    For the foregoing reasons, the judgment of conviction entered by the circuit court of Peoria County is affirmed and the fines and fees assessed are modified.

¶ 62    Affirmed as modified.