THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE LOGGINS, Defendant-Appellant.

First District (5th Division)    No. 1—91—3934

Opinion filed December 30, 1993.

Michael J. Pelletier and Patricia Mysza, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, Dori K. Leo, and Brian Clauss, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

A jury found Lawrence Loggins (defendant) guilty of the first degree murder of Gregory Freeman (victim) and of the aggravated battery of John Rucker. The trial court sentenced defendant to 33 years imprisonment for first degree murder and five years for aggravated battery, sentences to run concurrently. Defendant appeals his first degree murder conviction.

The issues presented for review are (1) whether defendant was proven guilty of first degree murder beyond a reasonable doubt, (2) whether defendant's due process right to present witnesses was violated because the trial court refused to transport the jury to a hospital so that the jury could hear testimony from a defense witness, (3) whether defendant's due process right to cross-examine and confront witnesses was violated, (4) whether two of the State's witnesses' testimonies were improperly bolstered at trial, (5) whether there exists a cumulative effect of trial errors which denied defendant a fair trial, and (6) whether defendant's sentence was excessive.

BACKGROUND

The evidence established that defendant shot and killed the victim during a fight. The victim was a member of the Black Disciples and defendant was a member of a splinter group called Renegade Disciples.

Defendant testified that on the date of the murder, he went to "Lowe" Park with about 15 other Renegades where they met the victim, who was accompanied by 20 to 25 Black Disciples. After a fight broke out, defendant testified that he saw the victim make a furtive gesture toward his jacket. Defendant thought the victim had a gun even though he never saw one. Defendant took a .22-caliber gun from a fellow gang member, pointed the gun at the victim, and fired. He gave the gun back to the fellow gang member. When defendant learned that the victim had died, he fled to Mississippi but later surrendered to the authorities.

Three State eyewitnesses, Tracie Anderson (Tracie), Latanya Freeman (Latanya), and Carmella Coleman (Carmella), testified that they were returning home from school at about 3 p.m. on November 13, 1989, and were in the vicinity of "Lowe" Park when they saw a crowd of people gathered in the middle of the park.

They saw approximately 10 people, including defendant and the victim in the middle of the crowd, fist fighting. After about 10 minutes, the fighting stopped and the crowd began to disperse. As the victim walked toward the street, defendant said "up the gat," a term which means gun. Defendant snatched a gun from another gang member, pointed it towards the victim, and fired. The victim fell on

his hands, got up, ran, and collapsed again. Defendant pointed the gun toward the crowd, shot four to six more times, and then walked out of the park.

Two of defendant's witnesses, Sharay Tillman (Sharay) and Lakenya Griffin (Lakenya), were in the middle of "Lowe" Park during the fight. Sharay, defendant's girl friend, and a Black Disciple gang member, testified that she saw two gang members fighting over a gun when defendant snatched the gun away from them. Sharay testified that defendant was about two feet away from the victim when he started shooting. The victim then ran toward the street holding his back.

Lakenya, a chief in the Black Disciples, testified that she was in the middle of the crowd and saw two gang members fighting over a gun. She saw defendant run 9 to 10 feet and snatch the gun out of a gang member's hand and shoot at the crowd. The victim, who was in the middle of the park, grabbed his back and ran out of the park.

Dr. Donoghue, an expert in forensic pathology, testified that the victim's bullet wound showed no sign of stippling. Stippling indicates a close proximity between the gun, when fired, and the target (body, in this case). Dr. Donoghue also testified that the victim had died from a single gunshot wound to the back. The bullet perforated the victim's lung, heart, pulmonary artery, and aorta.

I

Defendant contends that he was not proven guilty of first degree murder beyond a reasonable doubt and that, alternatively, he should have been found guilty of second degree murder. We disagree.

The proper standard for review when sufficiency of the evidence is challenged is, when viewing the evidence "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

Appellate courts must view the evidence in a light most favorable to the prosecution, and after viewing the evidence in such a light, if proof of the essential element of a crime supports a conviction, an appellate court must affirm. *People v. Stengel* (1991), 211 Ill. App. 3d 337, 345, 570 N.E.2d 391.

The same standard of review applies when the inquiry is whether the State has proven that defendant did not act in self-defense. *People v. Sanders* (1991), 212 Ill. App. 3d 773, 571 N.E.2d 836.

First degree murder is defined, in pertinent part, as follows:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another." Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2).

Second degree murder is defined, in pertinent part, as follows:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

\*\*\*

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2).

The statute further provides:

"When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c).

Defendant testified that, on the morning of the incident, he left his grandmother's home and walked towards Englewood High School. When defendant arrived at Englewood, he met more young men. When they were walking toward Paul Robeson High School, they took a short cut through "Lowe" Park and met the victim. The victim was with approximately nine other young men. The victim and his crew ran to Paul Robeson High School, where they met the rest of their friends.

As the victim and his group walked back, defendant and his group

followed them to the middle of "Lowe" Park. Defendant testified that there were about 14 Renegades with him and about 20 to 25 Black Disciples with the victim. Both sides started fighting when a Black Disciple threw a bottle and hit a Renegade Disciple in the face.

Defendant testified that he was about five feet from the victim when the victim said he was going to kill them. As defendant was going to help a fellow gang member, another fellow gang member pulled a gun and put it to a Black Disciple's face. Just then, defendant saw the victim "like go into his jacket." Defendant testified that he thought the victim had a gun. Defendant indicated that he moved 9 or 10 feet to snatch the gun from the fellow gang member's hand and "shot at" the victim.

The victim never moved his hand from his jacket. Defendant never saw the victim with a gun during the incident. Defendant further testified that the victim was standing toward him when the shot was fired. He testified that he fired four times and that the crowd broke up when it heard the gunshots. After the shooting, defendant returned the pistol to the gang member.

■ However, defendant's account of the murder is inconsistent with the medical proofs. Although defendant testified that victim was standing toward defendant when he observed the victim make a furtive gesture, the victim's autopsy report indicated that the victim had been shot in the back.

The right of self-defense does not justify an act of retaliation and revenge, nor the pursuit of the original aggressor who has abandoned the quarrel. *People v. Hines* (1975), 31 Ill. App. 3d 295, 301, 334 N.E.2d 233.

The court, in *People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547, articulated the following law pertaining to self-defense:

> "The use of deadly force in defense of the person is justified where (1) force is threatened against the person, (2) the person threatened is not the aggressor, (3) the danger of harm is imminent, (4) the force threatened is unlawful and (5) the person threatened actually believes that a danger exists, that the use of force is necessary to avert the danger, that the kind and amount of force used are necessary and that such beliefs are reasonable. [Citations.] The issue of self-defense presents a question of fact to be determined by the trier of fact, and if the trier of fact determines that the State has negated beyond a reasonable doubt any one of the elements justifying the use of force, then the State has carried its burden of proof. *** The decision of the trier of fact on the issue of self-defense will not be disturbed on review unless the evidence is so improbable or unsatisfactory as to raise a rea-

sonable doubt of guilt." *Balfour*, 148 Ill. App. 3d at 221-22, 498 N.E.2d 547.

The fact that defendant claims to have acted in self-defense and testified to his version of the murder is insufficient to elevate his claim to the level of reasonable doubt when his testimony is viewed in light of the other facts and circumstances of the case.

The jury found that the State proved defendant guilty of first-degree murder beyond a reasonable doubt. The jury's verdict is supported by the evidence.

## II

Defendant contends that his due process right to present witnesses was violated because the trial court refused to transport the jury to a hospital so that it could hear testimony from one of his witnesses. We disagree.

The right of a defendant to call witnesses in his own behalf is a fundamental right and is essential to due process. *Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 35 L. Ed. 2d 297, 308, 93 S. Ct. 1038, 1045.

A court, in its discretion, may permit a jury to view evidence outside of the courtroom. *People v. Durso* (1968), 40 Ill. 2d 242, 251, 239 N.E.2d 842 (Trial court denied defendant's motion to permit jury to go outside to parking lot and personally examine the car in which the murder occurred).

Defense counsel, during his case in chief, notified the trial judge that a subpoenaed witness, with injuries unrelated to the instant case, was hospitalized. By doctor's orders, the witness could not leave the hospital to testify for more than a two-hour period. Defendant motioned the trial judge to allow the jury to go to the hospital and listen to the witness' testimony.

In denying the motion, the trial judge made the following comments:

> Last week, as you stated, this issue was raised. I discussed it then. I told you that I wouldn't be inclined to make arrangements at great expense and loss of time to arrange for bus transportation for the jury to travel to the Rehab Institute located east of Michigan Avenue in the downtown area. Last week after that you indicated that the witness would be available, that he could be transported here under guarded medical protection.
>
> Now, [defense counsel], you are telling me that the witness won't be available separate and apart from that 120-minute consideration, and you are asking that the jury be transported to the Rehab Institute on today the last day of trial. Your motion is denied."

Defendant contends that the witness was material and that he

would have testified that the victim carried a gun and had threatened to kill defendant two days before the shooting. However, other defense witnesses testified that they had seen the victim with a gun and/or submachine gun. Witness Lakenya testified that the victim took a gun to Black Disciple meetings and that, prior to the fatal shooting, the victim stated that he was going to "get" defendant.

■ Since three of defendant's witnesses testified to seeing the victim with a gun on prior occasions and or threatening defendant just prior to the murder, the hospitalized witness' testimony would have merely corroborated testimony already in evidence. The trial court did not abuse its discretion because such testimony would also have been cumulative and, if erroneous, was harmless.

### III

Defendant contends that his due process right to cross-examine and confront witnesses was violated. Specifically, defendant asserts that he was denied his due process right to cross-examine the People's witness regarding whether the victim usually carried a gun and whether the victim committed prior acts of aggression against the other gang members. We disagree.

As stated earlier, the right to confront and cross-examine witnesses is essential to due process. However, the right to confront and cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *Chambers*, 410 U.S. at 295, 35 L. Ed. 2d at 309, 93 S. Ct. at 1046.

Evidence of a victim's violent character is admissible on a self-defense theory that the victim was the aggressor. (*People v. Lynch* (1984), 104 Ill. 2d 194, 199, 470 N.E.2d 1018.) Evidence of character is confined to proof of a person's general reputation and it is error to prove character by specific acts. *People v. Goodwin* (1981), 98 Ill. App. 3d 753, 757, 424 N.E.2d 429.

Defendant cites to the following transcript as evidence that his due process right to cross-examine the People's witness, Tracie Anderson, was violated:

"[DEFENSE COUNSEL]: You do, you did know that Gregory Freeman usually carried a gun, right?

[PROSECUTOR]: Objection, Judge.

[PROSECUTOR]: Objection.

[THE COURT]: Sustained.

[PROSECUTOR]: Counsel knows that is improper, Judge.

[THE COURT]: The jury is instructed to disregard that. [Defense counsel], that is absolutely an improper question.

[DEFENSE COUNSEL]: Tracie, in the year that you were good friends with Gregory Freeman [the victim] had you seen him get aggressive and face Calvin with People in the Renegades?

[PROSECUTOR]: Objection.

[THE COURT]: Sustained.

[DEFENSE COUNSEL]: Your Honor, again I would like to be heard very briefly on that issue.

[THE COURT]: No sidebar. Objection sustained.

[DEFENSE COUNSEL]: All right.

[THE COURT]: Specific acts of misconduct."

■ Regarding the cross-examination of Tracie as to whether she knew that the victim usually carried a gun, the record established that other witnesses testified that they had specific knowledge of instances when the victim had a gun. Therefore, this testimony is cumulative as well as corroborative. Defendant argues, however, that the cross-examination should have been allowed as the jury would be more likely to believe Tracie because she was a State witness.

We do not believe that allowing the cross-examination of Tracie about the gun would have resulted in a different decision. Assuming, *arguendo*, that the denial of this cross-examination was error, it was harmless error.

In considering the cross-examination of Tracie as to whether she had seen "Gregory Freeman get aggressive and face Calvin with people in the Renegades," we feel that the court properly sustained the objection albeit for the wrong reason. The question was improper because the word "aggressive" does not convey any specific acts of behavior for consideration. It is a conclusion and a characterization to assert that a person is "aggressive." Also, the question is a compound question.

However, even if the ruling constituted error, in light of the testimony of other witnesses who testified to specific acts of the victim's aggressiveness, the error was harmless.

Defendant cites *Lynch*, *People v. Keefe* (1991), 209 Ill. App. 3d 744, 567 N.E.2d 1052, and *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144, for the proposition that the victim's aggressive and violent character may be admitted to support a theory of self-defense. However, these cases cited by defendant are distinguishable.

In *Lynch*, on cross-examination, defense counsel asked the witness if he was aware the victim had battery convictions. In *Lynch*, the State had furnished the defense with the arrest report of the victim which listed the battery convictions. The *Lynch* case held that the battery convictions could be used to show that the victim was the aggressor. Here, it is uncertain what constituted the "aggression."

In *Keefe*, defense counsel asked the witness whether the victim had been fighting or trying to fight on the evening of the stabbing, before the altercation with the defendant. Again, in that case, the

questioning was more specific. There, the defendant did not improperly ask the "catch-all" question asked in this case: whether the victim had been "seen to get aggressive."

In *Hanson*, the court stated that the defendant should have been allowed to present evidence from witnesses who saw the victim's prior acts because the offer of proof indicated the witness' version of the victim's act was significantly different from the victim's version. Again, in the instant case, regarding the question about aggression, the victim does not properly identify any prior acts. Thus, *Hanson* does not apply.

We hold that defendant's due process right to cross-examine was not denied.

## IV

Defendant contends that two of the State's witnesses' testimonies were improperly bolstered on direct and redirect examination with evidence that they made out-of-court statements consistent with their trial testimony. We disagree.

The People contend that this issue is waived because, in accordance with *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, in order to preserve an issue for appeal, defendant must raise the issue at trial and include the matter in a written post-trial motion. Here, the People contend that defendant failed to object to the witnesses' testimony at trial and failed to raise the issue in his motion for new trial; thus, the issue is waived.

Defendant cites that the plain error rule permits a reviewing court to consider a trial error not properly preserved for review where the evidence is closely balanced so as to preclude the possibility that an innocent person was wrongly convicted, or where the error was so fundamental and of such magnitude that the defendant was denied a fair trial. Defendant asserts that the testimony of two of the People's witnesses, Tracie and Carmella, was improperly bolstered on direct and redirect examination with evidence that they made out-of-court statements consistent with their trial testimony.

Evidence that a witness made a prior statement which is consistent with his testimony is generally inadmissible. Evidence of a prior consistent statement is admissible when: (1) it is charged that testimony of the witness is of recent fabrication or that the witness has some motive for testifying falsely, and (2) the prior statement, consistent with the testimony, was made before the time of the alleged fabrication or before the motive to testify falsely came into existence. *People v. Powell* (1973), 53 Ill. 2d 465, 474-75, 292 N.E.2d 409.

Defendant cites Tracie's following direct testimony:

"[PROSECUTOR]: Tracie, you spoke with some police officers about this incident, is that right, about what you saw?

[TRACIE]: Yes.

Q. When in relation to the shooting did you speak with those officers?

A. I spoke with one the same day they had came to Miss Freeman's house and talked to me.

Q. Did you tell them at that time what you saw?

A. Yes.

Q. And did you later come to here at 26th street and provide a statement?

A. Yes."

Defendant cites Tracie's following cross-examination:

"[DEFENSE COUNSEL]: Okay. I'd like to [sic] you [sic] take a minute, Tracie, to read that and tell the jury whether or not in there it says anything about the comments that Lawrence [Defendant], that you said you made to the police in you [sic] statement that Lawrence said up the gap [sic].

[TRACIE]: No. I know it is not in this statement. I thought he was talking about when I was talking to them upstairs.

Q. At Mrs. Freeman's house?

A. No.

Q. Where?

A. That is when I came, that is the one when I first came here to the State.

Q. This is the one when you, you mean when you first went to the station that is what you said to the cops?

A. Yes. No. That is what I first said to the cops.

Q. This one is Exhibit No. 3?

A. Yes.

Q. And nowhere in that statement did you put that comment you heard Lawrence yell up the gap [sic], did you?

A. No.

Q. But you were given the chance to add it before you signed it right?

A. Yes."

It is on redirect examination that defendant contends that Tracie was impermissibly allowed to testify as follows:

"[PROSECUTOR]: Did you tell these ladies and gentlemen everything that you saw on November 13th, 1989?

[TRACIE]: Yes.

Q. Specifically, did you tell the police officers that shortly after the shooting?

A. Yes.

Q. That is the same thing you told the ladies and gentlemen today, right?

A. Yes."

Defendant cites Carmella's direct examination as follows:

"[PROSECUTOR]: Was it Fred McKinley?

[CARMELLA]: Yes.

Q. That is the detective that you spoke to?

A. Yes.

Q. Did you tell him everything that you told the ladies and gentlemen today?

A. Mostly, yes.

Q. All right. Is there anything—did you also speak with anybody else regarding this incident?

A. Yes.

Q. And who else did you speak with?

A. We had came down to, it was on 26th and California. There were some more people, and it was like—

Q. Two months?

A. It was like 2 months ago, yes.

* * *

[same witness A]: We had spoke to, I think it was an attorney at the time, was a state representative. I don't know.

Q. A state's attorney?

A. Yes.

Q. All right. Did you speak with a state's attorney a couple of days after it happened, as well?

[DEFENSE COUNSEL]: Objection, leading.

A. I don't recall.

[THE COURT]: Overruled. It is—

[DEFENSE COUNSEL]: Judge, he is prompting this witness left and right. I am letting it go. It is getting out of hand.

[THE COURT]: All right. That particular question really, a preliminary type question. The answer may stand.

Q. Did you ever provide a written statement regarding what you saw?

A. Yes.

Q. And do you remember when you gave that written statement?

A. Yes.

Q. When was that?

A. It was like about a week or 2, I think, or a month after, you know, everything had happened. We was being examined down—

Q. All right. Is that what you remember right now, Carmella?

A. Yes."

Carmella's cross-examination occurred as follows:

"[DEFENSE COUNSEL]: You said, this is your statement. Do you see the statement dated at the top? What does that say?

[CARMELLA]: The 15th.

Q. All right. November 15th, what time?

A. 8:50.

Q. 8:50 p.m.?

A. Yes.

Q. All right. When you were asked to explain to the officer and the state's attorney what happened that day, you told them what you remembered, correct?

A. Right.

Q. And they asked you, tell you if they remember, correct?

A. Right.

\* \* \*

Q. Did you tell the police that you actually heard Lawrence say, 'Up the gat,' and then grabbed the gun?

A. Yes.

Q. You told them that?

A. Yes.

Q. It was in your statement?

A. No.

[PROSECUTOR]: Objection to the form of the question, as it being in her statement, Judge.

[THE COURT]: All right. The answer 'No,' may stand.

Q. All right. You had a chance to look at this before you came here to testify today, right?

A. Right.

Q. You have read it over?

A. Uh-huh.

Q. All right. You know that nowhere in what is written here is there anything about Lawrence saying, 'Up the gat,' right?

A. Right.

Q. Before you signed this, they asked you to read it over, didn't they?

A. Right.

Q. And they asked you to make any changes, or corrections, or additions, or deletions that you needed to make it accurate; is that right?

A. Right.

Q. In fact, you signed the bottom of Page 1, right?

A. Right.

Q. In fact, you initialed changes on Page 2 in the 1, 2, 3, 4, 5, 6 line. You put your initials, CC right there, right?

A. Yes.

Q. These are your initials, aren't they?

A. Yes.

Q. All right.

A. Yes."

Defendant contends that, on redirect examination, Carmella was impermissibly allowed to testify as follows:

"[PROSECUTOR]: Now, Counsel asked you whether or not we had spoke [*sic*] to you about what happened; is that right?

[CARMELLA]: Right.

Q. We did, didn't we?

A. Right.

Q. Did you tell us everything you told the ladies and gentlemen?

A. Yes.

Q. Can you take a look at them and tell them if you told them the truth?

A. Yes.

Q. Did the State's Attorney's Office or any police officer during the course of this investigation ever ask you or tell you to, or suggest to you to say anything other than the truth?

A. No."

■ The State contends that the redirect was a proper effort to rehabilitate the witness. We agree, except for the State's question to Carmella: "Can you take a look at them and tell them if you told them the truth?" We consider this question to be an improper attempt to rehabilitate the witness as to her veracity. The witness cannot lift herself by her own bootstraps.

The determination of the credibility of a witness and the weight afforded his testimony is a function of the jury. (*People v. Townsend* (1957), 11 Ill. 2d 30, 45, 141 N.E.2d 729.) Although this question constitutes error, defendant did not object and can be considered to have waived the error. However, in this appeal, even if the error were not waived, the State's evidence is overwhelming and the error harmless.

V

Defendant asserts that the cumulative effect of the trial court's errors in restricting his ability to present evidence to support his self-defense theory and in allowing the testimony of the State witnesses to be improperly bolstered denied him a fair trial. We disagree.

■ A defendant cannot assert that the cumulative effect of alleged errors deprived him of a fair trial if he has failed to demonstrate "anything approaching reversible error" in his argument to justify a new trial. (*People v. Albanese* (1984), 102 Ill. 2d 54, 83, 464 N.E.2d 206.) In this case, defendant has failed to demonstrate that the errors approach reversible error.

VI

Defendant contends that the trial court abused its discretion in

sentencing him to 33 years' incarceration given his youth and the fact that he was a first-time offender with strong rehabilitative potential. We disagree.

The State contends that defendant waived this issue because he failed to make a timely objection at the sentencing hearing or in a post-trial motion. We agree with the State.

Section 5—8—1(c) of the Unified Code of Corrections provides:

"A motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 30 days after the sentence is imposed. ***

If a motion to reduce a sentence is timely filed within 30 days after the sentence is imposed, the proponent of the motion shall exercise due diligence in seeking a determination on the motion and the court shall thereafter decide such motion within a reasonable time.

If a motion to reduce a sentence is timely filed within 30 days after the sentence is imposed, then for the purposes of perfecting an appeal, a final judgment shall not be considered to have been entered until the motion to reduce a sentence has been decided by order entered by the trial court." Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(c).

Failure to file a post-trial motion to reduce a sentence "denies the trial court the opportunity to correct any error that might have occurred" and waives subsequent review of that issue in the appellate court. *People v. Macke* (1992), 224 Ill. App. 3d 815, 816, 587 N.E.2d 1113.

We address the merits of defendant's contention based on the reasons expressed in *People v. Gomez* (1993), 247 Ill. App. 3d 68, 71, 617 N.E.2d 320:

"Mindful, however, of the division within the appellate court on this issue (see *People v. Turner* (1992), 233 Ill. App. 3d 449, 456, 599 N.E.2d 104 (expressly rejecting *Macke* and holding that a motion to reduce sentence is not a necessary precondition to appellate review of that sentence); *People v. Sims* (1992), 233 Ill. App. 3d 471, 473, 599 N.E.2d 137 (same); see also *People v. Hess* (1993), 241 Ill. App. 3d 276, 283 (recognizing the disagreement among the appellate districts but reaching the merits of the case on the basis of plain error)) ***."

Determination of the sentence to be imposed is a matter of judicial discretion, and where the sentence is within statutory limits, the trial court's decision will not be disturbed absent an abuse of discretion. (*People v. Lacey*, 256 Ill. App. 3d at 20, 26; *People v. Harris* (1991), 220 Ill. App. 3d 848, 864, 580 N.E.2d 1342.) Because great deference is afforded the trial court's discretion, a rebuttable presump-

490

tion exists that the sentence imposed is proper. *People v. Hall* (1987), 159 Ill. App. 3d 1021, 1033, 513 N.E.2d 429.

■ In the instant case, the trial court considered defendant's age, the circumstances of the crime, defendant's lack of a criminal record, and his rehabilitative potential. Further, the 33-year sentence was well within the statutory guidelines for first degree murder. Thus, the trial court made an informed and deliberate decision when imposing defendant's sentence. No abuse of discretion occurred here.

Judgment affirmed.

GORDON, P.J., and MURRAY, J., concur.