2023 IL App (2d) 220008
No. 2-22-0008
Opinion filed April 17, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) | |
| v. | ) ) | No. 20-CF-1039 |
| DEVON C. COLEMAN, | ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Hudson[1] concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Devon C. Coleman, was tried on a multicount indictment arising from the shooting death of Jordan Durr. He appeals his convictions on counts I and II, charging intentional or knowing murder based on accountability (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)), and counts IV and V, charging felony murder (*id*. § 9-1(a)(3)). He contends the State failed to prove that (1) the murder charged in counts I and II was without lawful justification and (2) he committed a

_____

[1]Justice Hudson participated in this appeal but has since passed away. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

forcible felony as a predicate for the felony murder charged in counts IV and V. For the following reasons, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3     The State indicted defendant on one count each of first-degree murder with the intent to kill or do great bodily harm to Durr (*id*. § 9-1(a)(1) (West 2020)) (count I); first-degree murder knowing that his acts created the strong probability of death or great bodily harm to Durr (*id*. § 9-1(a)(2)) (count II); first-degree murder during the commission of, or attempt to commit, a forcible felony (armed robbery) (*id*. §§ 9-1(a)(3), 18-2) (count III); first-degree murder during the commission of, or attempt to commit, a forcible felony (aggravated unlawful use of a weapon—no Firearm Owner's Identification (FOID) card) (*id*. §§ 9-1(a)(3), 24-1.6(a)(3)(C)) (count IV); first-degree murder during the commission of, or attempt to commit, a forcible felony (aggravated unlawful use of a weapon—under age 21) (*id*. §§ 9-1(a)(3), 24-1.6(a)(3)(I)) (count V); and armed robbery (*id*. § 18-2(a)(2)) (count VI). Although the indictment alleged that defendant shot Durr, the State proceeded at trial under a theory of accountability as to counts I and II.

¶ 4     The following facts were established at defendant's bench trial. On the evening of June 8, 2020, defendant and his classmate Phillip Walker, who were both 17-year-old high school students, arranged on Snapchat to buy a handgun from a classmate named Shanquan Watson. Defendant testified that he wanted a handgun for "protection." Defendant and Watson agreed on a price of $250, and Watson instructed defendant to meet him later that evening in a parking lot of the Fox View Apartments in Carpentersville. Walker gave defendant $100 towards the price of the gun. Watson and Walker lived at the Fox View Apartments, and defendant formerly lived there. The Fox View Apartments were next to their high school. Defendant knew the Fox View Apartments was a dangerous, high-crime area where shootings were common.

¶ 5    When defendant and Watson made the arrangements for the purchase of the gun, defendant and Walker were visiting defendant's grandmother in Maywood. Also present was Joel Leitner, defendant's 27-year-old relative from Tennessee. Defendant asked Leitner to drive defendant and Walker to defendant's home in East Dundee so that defendant could pick up some clothes. Defendant testified that he knew Leitner owned a firearm but did not know that Leitner usually carried it or that he brought it with him from Tennessee. When Leitner drove to East Dundee, defendant did not see a firearm and he did not know whether Leitner had a firearm on him. Leitner drove his Ford Mustang, with defendant in the front passenger seat and Walker in the backseat directly behind defendant.

¶ 6    When the three reached defendant's home, defendant directed Leitner to drive onward to 9 Oxford Drive in the Fox View Apartments. Defendant did not tell Leitner that he planned to purchase a firearm. They arrived there at around 9 p.m. They initially parked in a lot north of 9 Oxford Drive, but Watson texted defendant and directed them to a different lot. After parking there, they waited for Watson to arrive. As they waited, defendant noticed several people surrounding their car. Defendant began to feel a "deep sense of paranoia and just became skeptical about what was going on."

¶ 7    Surveillance video collected from the Fox View Apartments shows Watson and Jaheim Vassar approach and go directly outside the driver's side of Leitner's Ford Mustang. Durr, whom defendant did not know, approached the passenger door. According to defendant, Durr immediately opened the passenger door, reached into the car, and said not to worry, because he was not doing what they thought he was trying to do. Durr said that he just needed a phone charger. Through Durr's white shirt, defendant saw a handgun with an extended magazine sticking out of

his waistband. The gun defendant and Walker were there to buy was supposed to have an extended magazine.

¶ 8        According to defendant, as Durr reached into the car, he looked at the key fob in the ignition. When Durr tried to grab the key fob, Leitner attempted to knock his hand away. However, Durr still managed to capture the key fob. Durr stepped back, pulled the gun from his waistband, pointed it at them, and demanded that they give him "everything." Defendant believed that they were being robbed, that they were the victims of a "lick."

¶ 9        While Durr pointed the gun at them, Leitner removed a handgun from the center console. Leitner fumbled the gun, and it fell into the backseat area. Durr, who was entirely outside of the car, was still pointing his gun at them. The Mustang's interior was dark, and defendant did not see Walker pick up the gun. Defendant heard a shot go off in the car but did not see who was shot.

¶ 10        According to defendant, he then panicked and ran from the car. Leitner ran in the same direction as defendant. About 30 seconds later, defendant returned to the car. He did not see where the other men went. Walker was there, but defendant could not recall if he was in or out of the car. Nor could he recall whether Walker had a gun in his hand.

¶ 11        According to defendant, he learned from his companions that Durr, "the attacker," went behind a dumpster. When defendant realized that the key fob was missing, he searched the area near the dumpster, where Durr was lying. According to defendant, it was too dark to see anything. Defendant did not take Durr's money, wallet, or lighter or touch Durr's body. At one point, defendant used Walker's cell phone as a flashlight to find the key fob, but he never found it.

¶ 12        When the police arrested defendant, he still possessed Walker's phone. In addition, defendant had cash in both pants pockets. The $41 in cash in his right pants pocket was from his grandmother, and the $350 in cash in his left pocket was for buying the gun and from Walker. The

agreed price was $250. Walker gave defendant $100 towards the purchase of the gun. Defendant denied going to 9 Oxford Drive to rob or shoot anyone. Defendant knew at the time that it was illegal for them to purchase the firearm, because they were under 21.

¶ 13 On June 8, 2020, at about 9:11 p.m., Officer John McDonnell of the Carpentersville Police Department was parked in his squad car at the Fox View Apartments. After hearing loud bangs, he was dispatched to 9 Oxford Drive to investigate a report of shots fired.

¶ 14 When he arrived, he saw three men—later identified as defendant, Walker, and Leitner—walking from the area of a concrete dumpster toward a vehicle. McDonnell ordered the men to the ground. While other officers watched the men, McDonnell located the victim, Durr, lying in the grass behind the dumpster. Although he attempted to provide aid, he soon concluded that Durr was deceased.

¶ 15 When he searched the area near Durr, McDonnell found car keys on a red key chain, a handgun on a white T-shirt, a wristwatch with fresh blood, a Gatorade towel, a wallet, a red lighter, and a phone charger cord. McDonnell testified that, when he ordered the men to the ground, Leitner placed both a cell phone and a black Smith and Wesson 9-millimeter handgun on the ground. McDonnell put the cell phone on the roof of his squad car. During cross-examination, he explained that the handgun he found near Durr's body was .40-caliber with an extended magazine.

¶ 16 Carpentersville officer John Hailer was also dispatched to 9 Oxford Drive. When he arrived right behind McDonnell, he encountered three men on a grassy area adjacent to the parking lot. He ordered them to the ground. As he walked toward the men, he saw Durr lying on the ground near a dumpster.

¶ 17 As Hailer approached Durr, he saw McDonnell begin to give Durr aid. Another man, Amilkar Vasquez, was lighting the area with a cell phone. Vasquez later handed a cell phone to

Hailer. It was a black Apple iPhone with a cracked screen. After Durr was taken to the hospital, McDonnell handed Hailer a Smith and Wesson 9-millimeter handgun. When Hailer released the magazine and pulled back the slide, a spent shell casing ejected from the gun.

¶ 18    During cross-examination, Hailer testified that he saw nothing in the hands of defendant, Walker, or Leitner. He found a Smith and Wesson .40-caliber handgun with an extended magazine within three to five feet of Durr.

¶ 19    Carpentersville officer Anna Kocheulova was also dispatched to the scene. She transported defendant to the police station. When she searched defendant's right pants pocket, she found a black cell phone.

¶ 20    Dr. Mitra Kalelkar, the forensic pathologist who autopsied Durr, testified that he died from a single bullet that passed through his left arm, entered the left side of his chest cavity, and perforated his left lung, heart, and right lung before lodging in his right back. She opined that Durr would have died within minutes of being shot. Although she did not determine the caliber of the bullet, she estimated it was medium sized. Durr also had marijuana, amphetamine, and methamphetamine in his system.

¶ 21    Carpentersville detective John Franco testified that he collected items found on Durr's body. A nurse directed Franco to packaged drugs hidden in Durr's groin area. In addition, Franco found a charging plug (but no cord) in Durr's pants pocket. Franco also collected the slug recovered from Durr's body. To Franco, the slug appeared to be consistent with 9-millimeter ammunition.

¶ 22    Carpentersville officer Ian Abrahamsen testified that, from prior police contacts, he was familiar with Vassar, also known on Facebook as "Jat Thorton," and Watson, whose Snapchat username was "shanquan2." In reviewing video from several security cameras overlooking the

parking lot area of 9 Oxford Drive, Abrahamsen saw Vassar and Watson walk up to the driver's side of the Ford Mustang. At the same time, Durr approached the passenger's side. In another video, he identified Vassar, Watson, and Durr walking toward the Mustang.

¶ 23    Todd Rohlwing was the director of safety and security for School District 300, which included Dundee Crown High School, located next to the Fox View Apartments. One of the school's security cameras covered a school parking lot adjacent to 9 Oxford Drive. The camera was motion activated. When Rohlwing reviewed the video from that camera for an unrelated purpose, he saw what appeared to be a crime being committed at 9 Oxford Drive, so he provided the video to the Carpentersville Police Department.

¶ 24    According to Carpentersville paramedic Samuel Stucker, no paramedic removed Durr's wristwatch, wallet, or anything else from his pockets while aiding him at the scene.

¶ 25    Mary Wong, an expert in gunshot residue analysis with the Illinois State Police (ISP), examined gunshot residue tests from Durr, defendant, Leitner, and Walker. She opined that there was no evidence that Durr, Leitner, or defendant fired a weapon. However, the test showed that Walker had discharged a firearm with his right hand. Also, residue recovered from the Mustang's front passenger door interior suggested that a firearm was discharged in the vicinity.

¶ 26    Carpentersville crime scene investigator Beth Eichinger processed the crime scene. She located a white Apple cell phone on top of the Mustang. She also found a wallet belonging to Leitner on top of the Mustang. On the grassy area behind the dumpster, she found a wristwatch, Durr's wallet, a Ford key fob, a red Bic lighter, and a black Smith and Wesson .40-caliber handgun with an extended magazine. Hailer handed her a black Smith and Wesson 9-millimeter handgun and a magazine containing eight rounds of 9-millimeter ammunition. She also found a black LG cell phone on the front passenger seat of the Mustang and another black LG cell phone on the rear

passenger seat of the Mustang. Additionally, Hailer handed her a black Apple phone with a cracked screen. She also collected and examined a Gatorade towel, which had no bloodstains on it. When she examined the black sweatpants taken from defendant, she found $350 in the left pocket and $41 in the right. She testified that it was dark behind the dumpster when she arrived, which required her to use a flashlight. The grass behind the dumpster was of average length.

¶ 27   Christine Aper, a latent fingerprint identification expert with the ISP, testified that she examined for latent prints a key fob, a Smith and Wesson 9-millimeter handgun with a magazine, a Smith and Wesson .40-caliber handgun with an extended magazine, a wallet, a Bic lighter, ammunition, currency, and a wristwatch. Only on the currency did she find a latent print suitable for identification. That print, however, did not match defendant, Walker, Leitner, or Durr.

¶ 28   Blake Aper, an expert in forensic biology and DNA with the ISP, examined swabs taken from gun grips and triggers. He opined that it was impossible to make any meaningful comparisons to any specific DNA profiles because of the mixtures of DNA found.

¶ 29   The parties stipulated that, on June 8, 2020, defendant, Walker, and Leitner did not have valid FOID cards.

¶ 30   Kane County sheriff's deputy Steve Bruening testified as a cell phone forensics expert. He applied a cell phone analysis system to five cell phones recovered in the case. In analyzing an Apple phone belonging to Durr, Bruening made several screen captures of messages exchanged on June 8, 2020. The first was a Facebook message at 7:59:53 p.m. from Jat Thorton to "Bud G" (Durr's Facebook name), stating, " 'I got a lick on his way, he got 500, and tonight it's gone B-.' " At 8:11:20 p.m., there was a text message from Bud G to Jat Thorton, saying, " '[I]t's on, gang, let's get this money.' " At 9:11:50 p.m., Durr's phone answered an unidentified call. On cross-

examination, Bruening testified that the term "lick" is usually used in drug cases and that he had never heard it used regarding a robbery.

¶ 31    Leitner's Apple phone showed an outgoing 911 call at 9:11:57 p.m. on June 8, 2020. A black Apple phone taken from defendant's pocket when he was arrested showed messages exchanged with Watson on June 8, 2020. However, the phone made no 911 calls on June 8, 2020. Finally, Bruening analyzed two black LG cell phones, neither of which made 911 calls on June 8, 2020.

¶ 32    At the close of the State's evidence, defendant moved for a directed finding on all counts. The State nol-prossed count III, which charged felony murder based on the forcible felony of armed robbery. The trial court denied the motion as to counts I, II, IV, and V, but granted a directed finding for defendant on count VI, charging armed robbery.

¶ 33    After the close of evidence, the trial court issued a written decision finding defendant guilty of felony murder based on aggravated unlawful use of a weapon (counts IV and V) and intentional or knowing murder based on accountability (counts I and II). As for the felony murder charges, the court found that aggravated unlawful use of a weapon constituted a forcible felony under the facts of this case. Specifically, the evidence established that defendant and his companions contemplated the possibility of using violence or a threat of violence to effectuate their criminal purpose of illegally buying a handgun. As for the charges of intentional or knowing murder based on accountability, the court found that defendant was an integral part of a group engaged in a common criminal design of illegally purchasing a handgun. As for self-defense, the court noted that in its evidentiary rulings at trial it had observed there was "some evidence of self-defense." The court further found that the State "did not rebut [that] evidence of self-defense in any way." However, the court concluded that self-defense was unavailable because it found that defendant

was attempting a forcible felony when Durr was killed. Thus, the court also found defendant guilty of counts I and II.

¶ 34    Following the denial of defendant's motion for a new trial or an acquittal, the trial court sentenced him to 20 years in prison.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, defendant contends that (1) the trial court erred by finding him guilty of felony murder (counts IV and V) because the underlying offense of aggravated unlawful use of a weapon is not a forcible felony under the facts of this case and (2) we must reverse his conviction of intentional or knowing murder (counts I and II) because the State failed to prove that Walker acted without lawful justification when he shot and killed Durr during the robbery attempt.

¶ 37                         A. Felony Murder—Forcible Felony

¶ 38    We begin with defendant's argument that, under the facts of this case, aggravated unlawful use of a weapon is not a forcible felony because there was no evidence that defendant, Walker, and Leitner intended to use or threaten to use violence to carry out the purchase of a firearm. The State counters that it proved that defendant committed a forcible felony, because the evidence established that defendant contemplated that violence might be necessary for him and Walker to carry out their common purpose of illegally purchasing a firearm. The State notes that defendant and his companions (consistent with earlier use) drove to a dark, secluded, and dangerous area to meet up with Watson; defendant and his companions were armed; and defendant had the purchase money for the firearm in one pocket and cash in another pocket. Curiously, the State fails to rationalize its argument in the context of defendant's plan to buy a firearm while Durr was committing an armed robbery. Aside from the lack of evidence that defendant contemplated the use of force to effect specific performance of the contract, the State disregards the reality that

Walker's response was an act of self-defense during a robbery attempt, memorialized by Durr's text message to his coconspirator. It is no wonder that, five weeks before defendant's bench trial, a jury acquitted Walker, the shooter.[2]

¶ 39    As explained earlier, aggravated unlawful use of a weapon was the predicate felony for defendant's felony murder. Section 9-1(a)(3) of the Criminal Code of 2012 (Code) states that first-degree murder, under a felony murder theory, is committed when a person, while "acting alone or with one or more participants, commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or she or another participant causes the death of a person." 720 ILCS 5/9-1(a)(3) (West 2020). Under the felony murder theory, a felon is responsible for the direct and foreseeable consequences of his actions. *People v. Lowery*, 178 Ill. 2d 462, 470 (1997). The purpose behind the felony murder statute is to limit the violence that accompanies the commission of forcible felonies, so that anyone engaged in such violence will be automatically subject to a murder prosecution should someone be killed during the commission of a forcible felony. *People v. Belk*, 203 Ill. 2d 187, 194 (2003). Under Illinois law, self-defense is not available to a defendant committing, or attempting to commit, a forcible felony. 720 ILCS 5/7-4 (West 2020); see also *People v. Moore*, 95 Ill. 2d 404, 411 (1983).

---

[2]We take judicial notice of Kane County case No. 20-CF-1041, wherein five weeks before the trial court found defendant guilty, Walker was tried for similar counts of intentional murder for shooting Durr and was found *not* guilty by a jury. See *People v. Walker*, No. 20-CF-1041 (Cir. Ct. Kane County, Oct. 22, 2021).

¶ 40    Section 2-8 of the Code (720 ILCS 5/2-8 (West 2020)) enumerates certain offenses as forcible felonies and aggravated unlawful use of a weapon is not listed. However, the section includes a residual clause defining a forcible felony as "any other felony which involves the use or threat of physical force or violence against any individual." *Id.* Pursuant to section 2-8's residual clause, an offense constitutes a forcible felony where the defendant contemplates that force or violence against an individual might be involved and the defendant has implied he was willing to use force or violence against an individual. *Belk*, 203 Ill. 2d at 195-96. The test for a forcible felony is not whether the felony is normally classified as nonviolent, but whether, under the particular facts of the case, it was " '*contemplated that violence might be necessary to enable the conspirators to carry out their common purpose*.' " (Emphasis in original and added.) *Id.* at 193-94 (quoting *People v. Golson*, 32 Ill. 2d 398, 407-08 (1965)). We review *de novo* whether a particular set of facts established that the commission of an unenumerated felony constituted a forcible felony under the residual clause of section 2-8 of the Code. *Belk*, 203 Ill. 2d at 192.

¶ 41    In *Belk*, a felony murder case, aggravated possession of a stolen motor vehicle was deemed not to be a forcible felony. In *Belk*, the defendant, age 16, and another person broke into a van and stole it. *Id.* at 190. The defendant, who was intoxicated, attempted to flee from police in the stolen van, driving over 100 miles per hour in an area where the speed limit was 30 miles per hour. *Id.* The area defendant sped through had numerous businesses that were still open for business, and there was traffic on the street and pedestrians on the sidewalk. *Id.* The defendant crashed into another vehicle, propelling it into the air. The vehicle caught fire after it landed 350 away from the collision, and both occupants died as a result of the crash. *Id.* Considering whether these facts gave rise "to an inference that at some point during his attempt to elude the police, [the defendant] contemplated that escape might involve the use of force or violence against an individual," our

supreme court concluded that, although the defendant was reckless and injury to pedestrians and other motorists was certainly foreseeable, nothing supported the inference that he believed "the use of force or violence against an individual might be *necessary* in order for him to accomplish his escape." (Emphasis in original.) *Id.* at 195.

¶ 42 Therefore, the issue is whether, under the particular facts of this case, defendant, Walker, and Leitner contemplated that violence might be necessary to enable them to carry out their common purpose. See *Belk*, 203 Ill. 2d at 828-29.

¶ 43 Here, the only evidence of a common purpose reveals that defendant and Walker set out to peacefully buy a firearm from their classmate, Watson. Defendant's conduct in attempting to buy a firearm was less egregious than the conduct that the supreme court found merely reckless in *Belk*. Defendant believed that he and Watson had agreed on a price of $250, and Watson chose the meeting place and time for the exchange. Defendant asked Leitner to drive defendant and Walker to the location, however, there is no evidence in the record that Leitner knew that they intended to purchase a firearm. When defendant, Walker, and Leitner arrived at the designated location, they were ambushed by three men and Durr removed Leitner's car keys from the ignition. After they were trapped in the car, Durr attempted to rob defendant, Walker, and Leitner at gunpoint, consistent with the plan expressed in an exchange of messages between Durr and Vassar, who was identified as one of the men who ambushed the Mustang. Approximately one hour before the shooting, Vassar messaged Durr stating, "I got a lick on his way, he got 500, and tonight it's gone B-." A few minutes later, Durr texted Vassar stating, "it's on, gang, let's get this money." See *People v. Watson*, 2021 IL App (1st) 180034, ¶ 5 (the defendant testified that she texted her cohort, " 'I got a lick for you' " and explained that "lick" is slang for robbery).

¶ 44 Nothing in the record indicates that these events were foreseeable to defendant or Walker when they arranged to purchase the firearm and traveled to complete the transaction. Although Walker used Leitner's firearm to shoot Durr, there is no evidence that, prior to the shooting, defendant or Walker knew there was a firearm in Leitner's car. The record indicates that defendant expected to peacefully buy a firearm. He had the cash ready to give to Watson in exchange for the firearm. Accordingly, nothing in the record supports a determination that defendant or Walker contemplated that force or violence against an individual might be involved in the unlawful purchase of a firearm from a classmate or that they were willing to inject force or violence into the agreement for purchase. Therefore, we hold that, under the facts of this case, the predicate offense of aggravated unlawful use of a weapon is not a forcible felony.

¶ 45 The State argues that the fact that one of the perpetrators was armed necessarily implied "that they contemplated that the use of force or violence against an individual might be involved and that they were willing to use such force or violence." (Emphasis omitted.) *Belk*, 203 Ill. 2d at 196. However, the presence of a firearm during the "commission of a felony does not determine whether the crime is a forcible felony." *People v. Greer*, 326 Ill. App. 3d 890, 895 (2002). Rather, the State must prove that, "under the particular facts of [the] case," the defendant contemplated the use of force and was willing to use it. *Belk*, 203 Ill. 2d at 195. Here, the record reveals that the State failed to prove that defendant and Walker contemplated that violence might be necessary to enable them to carry out their common purpose of illegally buying a firearm. Further, if the State's argument is sound, then anyone armed with a firearm, without authorization by the State, is guilty of felony murder if the individual causes a death defending themselves with a firearm. The contention strips a defendant of the presumption of innocence and the need for the State to disprove a claim of self-defense.

¶ 46    The State also argues that video and screen shots taken by a camera from a nearby high school make it clear that defendant's version of events leading up to the shooting of Durr is impossible. In particular, the State contends that these exhibits do not show Durr pulling a firearm from his waistband before Walker shot him. However, the exhibits at issue are, at best, inconclusive and, most importantly, do not change our conclusion that the State failed to prove that defendant and his companions contemplated that force or violence might be necessary to illegally purchase a firearm.

¶ 47                              B. Intentional or Knowing Murder

¶ 48    We next address defendant's contention that the State failed to prove beyond a reasonable doubt that Walker acted without lawful justification when he shot and killed Durr.

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> >
> > (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(1), (a)(2) (West 2020).

A defendant is legally accountable for the conduct of another when, either before or during the commission of the offense, and with the intent to promote or facilitate its commission, he solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense. *Id.* § 5-2(c).

¶ 49    Self-defense is a lawful justification for first-degree murder. *Id*. § 7-1(a). A person's use of deadly force against another is justified as self-defense where the person was (1) not the initial aggressor and (2) reasonably believed that the force was necessary to prevent (a) imminent death or great bodily harm to himself or another or (b) the commission of a *forcible felony*. *Id.* § 7-1; *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). When a defendant charged with murder raises self-defense, the State must not only establish beyond a reasonable doubt the elements of murder but must also prove beyond a reasonable doubt that the killing was not in self-defense. *Id.*

¶ 50    Armed robbery is a forcible felony. See 720 ILCS 5/2-8 (West 2020) (" 'Forcible felony' means *** robbery***."). A person commits armed robbery when he knowingly takes property from the person or presence of another by using force or by threatening the imminent use of force, and he is armed with a firearm. *Id.* §§ 18-1(a), 18-2(a)(2).

¶ 51    Where the defendant challenges the sufficiency of the evidence to convict, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Loggins*, 257 Ill. App. 3d 475, 478 (1993) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The same standard of review applies when the inquiry is whether the State proved that the defendant did not act in self-defense. *Loggins*, 257 Ill. App. 3d at 479.

¶ 52    Here, the evidence established that Durr was committing armed robbery when he forcibly reached into the vehicle and grabbed the keys from the ignition. Durr, without authorization, opened the passenger door, leaned into the front passenger area, and, despite Leitner's attempt to swat away his hand, forcibly removed the keys from the ignition. Durr then demanded that

defendant, Walker, and Leitner give him "everything." Further, although it was disputed that Durr pointed a firearm at the occupants, it was undisputed that he carried a firearm and that defendant saw it in his waistband.

¶ 53    Because the evidence showed that Durr was engaged in the forcible felony of armed robbery when Walker shot him, the State failed to prove beyond a reasonable doubt that the shooting was without lawful justification. Accordingly, the State failed to establish that Walker committed first-degree murder as counts I and II charged. By extension, defendant cannot be found guilty under a theory of accountability.

¶ 54    Finally, we note that the trial court's written decision appeared to suggest that self-defense was unavailable on counts I and II because defendant and his companions attempted to commit a forcible felony. However, as discussed, the prohibition on self-defense is limited to the felony murder context. Thus, the court erred to the extent that it extended that prohibition to counts I and II.

¶ 55                                    III. CONCLUSION

¶ 56    For the reasons stated, we reverse defendant's convictions.

¶ 57    Reversed.

*People v. Coleman*, **2023 IL App (2d) 220008**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CF-1039; the Hon. John A. Barsanti, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and R. Christopher White, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |